(No. 21441.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* CLYDE L. CASEY, Plaintiff in Error.

*Opinion filed December 23, 1932.*

Orr, J., took no part.

George W. Sprenger, for plaintiff in error.

Oscar E. Carlstrom, Attorney General, Homer H. Williams, and J. J. Neiger, (Charles E. Lauder, and A. W. O'Harra, of counsel,) for the People.

Mr. Justice Stone delivered the opinion of the court:

Plaintiff in error was indicted in the circuit court of Hancock county for the murder of Oliver Peck on November 2, 1931. On trial the jury found him guilty, found his age to be about forty-one years, and fixed his punishment at imprisonment in the penitentiary for a term of fourteen years. He brings the cause here for review, urging as his principal contentions that the evidence fails to prove him guilty beyond a reasonable doubt, and that the court erred in giving certain instructions on behalf of the People and in refusing certain instructions offered in his behalf.

The facts either not in dispute or clearly shown are, that on the night of November 2, at about midnight, the deceased, a married man about twenty-eight years of age though living separate and apart from his wife, a young man named Royal Landis, eighteen years of age, and his brother, Lyle, nineteen years of age, with Jayne Casey, the daughter of plaintiff in error, drove into the latter's yard. Plaintiff in error's daughter was sixteen years of age. The occupants of the car were all intoxicated. Plaintiff in error was preparing to leave at about that time for a hunting trip on the Mississippi river and was dressed in his hunting clothes and standing in the yard near his automobile, talk-

ing to his wife. As his daughter was being helped from the car plaintiff in error seized her arm and told his wife to take her into the house, which was done. Plaintiff in error thereupon turned to the car, all the occupants of which were well known to him, and taking the ignition key from the car, thus stopping the motor, demanded to know where these young men had been with his daughter at that time of night. As to what was said and the manner in which Peck was shot the evidence is not in agreement. It is not denied that plaintiff in error shot Peck, but he has steadfastly contended since the occurrence that it was an accident; that he had no intention of shooting him, though he admits that he was angry at the situation which confronted him on finding his daughter returning home at that hour in an intoxicated condition.

Plaintiff in error is a practicing physician and surgeon at LaHarpe, in Hancock county. On November 2 he had been hunting on Clear Lake, near the Mississippi river. He returned to LaHarpe in the early evening and made some professional and other calls. As he was planning to return to the hunting grounds he did not change his clothing but continued to wear hunting clothes, including a pair of high rubber boots. Early in the evening he delivered some ducks to friends at a restaurant known as the Black Cat Cafe and while there talked with Oliver Peck, the deceased, and others. After making a professional call in the country he went to his office and then home, where he prepared to again leave for the hunting grounds. His house is located on the south side of a street used and paved as a part of the State system of hard roads. Extending from that pavement into his yard is a driveway, surfaced with cinders. There is the usual slope from the shoulder of the pavement to the drain gutters and then another gradual rise of the driveway, south, into plaintiff in error's yard. The driveway leads to the garage in the rear. A brick sidewalk extends east and west along the front of plaintiff in error's

property. Plaintiff in error's car, which he was loading preparatory to leaving, was a four-door small car and was at that time standing in the driveway near the house. When the car containing the plaintiff in error's daughter and the young men turned into the driveway it faced in a southeasterly direction. They did not drive into the yard but the two rear wheels were on the pavement of the highway. The right front wheel of their car'was on the cinder driveway while the left front wheel was on the shoulder of the highway next to the pavement. The car occupied by them belonged to Peck and had the usual equipment of headlights, dome and dash-lights and was equipped with a radio. The latter was not in operation at the time.

It appears from the evidence that earlier in the evening Peck and Royal and Lyle Landis were seated in Peck's car in front of the Black Cat Cafe listening to the radio in the car, when Jayne Casey, the daughter of the plaintiff in error, and a Mrs. Eileen Bradshaw, approached the car and talked with the occupants. On invitation from the young men they got into the back seat of the car, the three men sitting in the front seat, and listened to the radio. They all drove about town for some time and then out on the hard road to a place about a mile west of town where Peck secured two half-pints of alcohol. They thereupon drove back to town and Jayne Casey went to the telephone office, where she found Lucille Shriver and invited her to join them, which she did. They then drove west from LaHarpe and secured near-beer and pop, which, after adding alcohol, they drank. About 9:30 they returned to town and Lucille Shriver got out of the car. The remaining five then drove west from LaHarpe on the State highway to Dallas City, some thirteen miles distant. At this place they procured more beer and pop, which they drank, with the addition of alcohol. They thereupon drove to Ft. Madison, Iowa, and secured lunches at a restaurant. They then returned to LaHarpe and on the return trip purchased more near-beer,

which, with alcohol added, was consumed. They also visited a school house in the country, where they danced on the front porch to the music furnished by the car radio. They again returned to LaHarpe and Mrs. Bradshaw was taken to her home and the four occupants of the car then drove to the home of plaintiff in error. Royal Landis was driving the car. Peck, the deceased, was seated on the right side of the rear seat. Lyle Landis was on the left side, and Jayne Casey was seated between them.

As to what occurred after the car drove in and plaintiff in error's daughter was sent into the house with her mother, the State produced two witnesses, Lyle and Royal Landis. Lyle Landis testified that where they drove off the pavement at plaintiff in error's home there was a slight slope from the pavement to the gutter. He testified they had their head-lights burning, although plaintiff in error's testimony is that when they turned in at the entrance to his yard they turned off the head-lights. Landis testified that plaintiff in error wanted to know where they had been; that the door on the right side of Peck's car, which was a two-door sedan, was open, and that plaintiff in error switched off the ignition, took the keys from the car and put them in his hunting-coat pocket. He testified that plaintiff in error said to them, "I know where you have been," and that he struck Royal on the nose, pushed Peck back into the seat with his hands, and struck at the witness but merely grazed his face. He testified that Dr. Casey said he was getting tired of having his daughter associate with a tough bunch of guys all the time, and that the witness told him they had not been doing anything out of the way; that at that time the doctor was standing on the ground, with one foot on the running-board; that he turned on the dome-light in the top of the car; that he left Peck's car, went to his own car, reached into a pocket on the right-hand door and returned with a gun in his hand. The witness also stated that upon Dr. Casey's return from getting the gun

Dr. Casey again asked them where they had been and was told that they had been out riding and not doing anything out of the way, and that they had been over to Ft. Madison and had some sandwiches. This witness testified that Dr. Casey stood partly in the car, holding the gun under the cowl, where the lights were, and "clicked" it; that while standing there William George and Loyd Snyder drove up and stopped and that Dr. Casey stepped back and waved them to go on. He testified that Dr. Casey had the gun in the hand which he waved. He stated that Dr. Casey was nervous and talked in a high-pitched voice, in a hurried tone; that Peck said to him, "If I am such a bad guy why don't you shoot me?" and that thereupon Casey "pulled the gun into Peck's face" and shot and Peck fell over into the witness' lap, and that Dr. Casey cried: "Oh, my God! I've shot him!" He testified that he told Dr. Casey to give them the keys to the car and they would take Peck to the hospital; that Dr. Casey threw the keys onto the seat and that they took Peck to the hospital, where they aroused one of the nurses, who told them to drive to the ambulance entrance of the hospital, which they did; that they put Peck on a wheeled stretcher, which was taken to the elevator and by that means to the first floor of the hospital, and that the nurse then felt his pulse and said that he was dead. This witness also stated that neither he nor the others in the car that night were drunk.

The evidence shows that when Peck was taken to the hospital Dr. Casey went there, opened the operating room and came down to the first floor, where he found the nurse and the two Landises with the deceased. He examined Peck and pronounced him dead.

On cross-examination Lyle Landis was asked if it was not true that either he or his brother said to plaintiff in error at the hospital: "We know you didn't shoot him on purpose; we know it was an accident and we will stand by you." He testified that he did not make such statement

and that no such statement was made. He was asked whether he had testified at the coroner's inquest in answer to a question whether any lights of the Peck car were lighted at the time of the shooting and if he did not answer, "Just the dash-light was on." He answered he did not recall but he would not say that he did not so testify. He was asked if the girls had been drinking and whether he had testified before the coroner's inquest that they had, and he answered that he had so testified. He was asked if one of the jurors at the coroner's inquest did not ask him the following question, "Did you see him actually shoot?" and whether he had replied: "I couldn't say I did; just the report was all I heard; it was so quick." He answered that he possibly so testified, though he testified on the trial that he saw Dr. Casey put the gun in the face of the deceased and saw him shoot. He also testified on the trial that he saw plaintiff in error whirl around and put his arm inside the car and shoot. He was asked if he had not testified at the coroner's inquest that he did not remember that plaintiff in error used any violence towards the occupants of the car. He would not say that he did or did not so testify but answered that he did not recall. He admitted that he had testified at the coroner's inquest that there was no loud talking; that after Oliver had said, "If you think I am such a bad guy why don't you shoot me," the next thing he heard was the report of a gun and Peck fell over into his lap. He also admitted that he testified before the grand jury that he did not hear any clicking of the safety of the gun, though he testified on trial that the gun was held under the cowl and he could hear the clicking sound of putting on and off the safety. Though denying that he or his brother had stated at the hospital that the occurrence was an accident, he admitted on cross-examination that Dr. Casey at the hospital had said to witness and his brother that it was an accident and said, "My foot stumbled," and that he showed them how it occurred.

Royal Landis' testimony as to what took place at the time was in substance as follows: That when they drove up to the yard Dr. Casey stepped to the car and took the keys out and put them in his pocket; that the lights stayed on; that Dr. Casey wanted to know where they had been and received no reply; that he hit the witness in the nose hard enough to break his nose, which he said had been broken a time or two before; that Dr. Casey stepped back from the car, went to his own car, opened the door, came back and again opened the door of Peck's car and said: "I should shoot all three of you—ought to kill all three of you;" that about that time William George and Loyd Snyder drove up, and that Dr. Casey stepped away from their car and motioned his hand for them to go on; that he waved his right hand and had his gun in that hand; that he came back to the car and the next thing the witness knew he heard a gun report, and Dr. Casey stepped back and said, "Oh, my God! I've shot him!" that he and his brother took Peck to the hospital and the witness drove the car to the hospital, which was a block-and-a-half away. He testified that he was not intoxicated at all during the evening, and that he did not know whether the others were or not. He admitted that he had testified before the coroner's jury that he did not see a gun in Dr. Casey's hand before Peck was shot. He admitted that he testified at the coroner's inquest that during the time of this occurrence Dr. Casey was standing with one foot on the running-board of Peck's car and the other on the ground and that he did not recall any lights being on in the car. Other witnesses testified that the dome-light was on. He was asked if at the coroner's inquest he was not asked the following question, "What was said to you men just before Peck was shot?" and if he did not answer, "I don't recall what was said; I can't remember a thing." He admitted that he had so testified. He admitted that he had testified before the coroner's jury that he had not heard Dr. Casey threaten to shoot

anyone before the shot was fired and that he had not heard Peck say anything to Dr. Casey before the shooting. He admitted that he was asked at the coroner's inquest whether he actually saw the shooting, and that he had replied he did not see Casey get the gun and shoot him—that he had just heard the report. He admitted that he testified at the coroner's inquest that Dr. Casey handed him the car keys and did not throw them on the front seat, though on the trial he testified that Dr. Casey threw the keys onto the front seat. He admitted that he was asked at the coroner's inquest, "Do you remember enough that you could tell whether or not you thought the shooting might be accidental?" and that he had replied: "We were sitting on the driveway; I don't know whether the car moved or not; it might have been an accident." Though admitting he so testified, he stated on the trial that the shooting was deliberate.

William George and Loyd Snyder were called as witnesses for the People and testified to having stopped at the Casey home when the Peck car and its occupants were there. They stated that they were told by Casey to go on—that the matter was not any of their business—and that he said it in a way which made it clear to them that he wanted them to go on. They testified on cross-examination that the dome-light of the Peck car was on and that they could clearly see everybody there; that they saw the hands of Dr. Casey, and that at the time he waved them away he had no gun in his hand and that they did not see a gun at any time.

Eileen Bradshaw, who was one of the party on the ride that night, testified that when they returned from Ft. Madison, Royal Landis was so intoxicated that he had difficulty in keeping the car on the pavement, and that all the men were intoxicated.

Esther Haywood, a nurse at the hospital, testified as to what occurred there. She stated that she heard all the con-

versation between Dr. Casey and the two Landises; that they and Dr. Casey were all sobbing; that the doctor kept saying it was an accident; that he did not intend to shoot Oliver, meaning the deceased; that the boys said they knew that he did not do it intentionally and they were going to stand back of him. She testified that Dr. Casey was very much disturbed, and repeated over and over that it was an accident and that he was going to commit suicide because he had killed his friend.

Luella Plank, the superintendent of the hospital, testified that she was present when Peck was brought to the hospital and came down to the first floor; that she was there when Dr. Casey and the Landises were there; that she heard Dr. Casey say he shot Oliver when his foot slipped on the running-board and that he did not intend to kill him, and that one of the boys put his arm around Dr. Casey's shoulder and said they knew it was an accident and that they would stand by him. She was not cross-examined on this testimony.

Dr. Casey's testimony is, that in preparing to go to the hunting grounds that evening he had put his pistol, which was a cheap type of German automatic, in his right trouser pocket, and that when he took the keys from the Peck car he put them into the same pocket with the gun. He states that he was angry; that he questioned the young men concerning their having his daughter out at that time of night and bringing her home in an intoxicated condition; that George and Snyder then drove up, and he told them to go on as it was not a matter of their concern, and that they departed. He testified that he then withdrew from his pocket the keys of the Peck car; that to do so it was necessary to take out his own keys and the gun, as the keys were similar to his, and the gun had to be removed to get the keys out of his pocket; that while sorting out the keys to the Peck car from his own he held the pistol in his right hand; that it was of a type which by squeezing the handle

became cocked, and that it had what is known as a "hair trigger"—that is, it was very easily discharged. He testified that while he was sorting out the keys he was standing with one foot on the ground and the other on the running-board of the car, with his right knee resting against the front seat, which had been turned down, and that as he was getting away from the car the gun in his right hand was discharged. He testified that Peck was sitting on the right side of the car; that when the gun was discharged one of the boys said, "I believe you hurt Oliver," and that to him that did not seem possible. He testified that the explosion was so close to his face that it blinded him, and he first looked at the top of the car to see whether there had been a hole shot through the top of it, and that he did not then realize that he had shot Peck. He testified that he went at once to the hospital and there saw Peck, the Landises and the two nurses; that he told them that it was an accident, and the Landises said they knew it was. He also testified that he threw the gun into some bushes as he went to the hospital, and on his return, he, Mrs. Casey and Miss Haywood tried to find it but could not, and that he told the city marshal to look for it. Jack Pryor, the city marshal, corroborated this statement and testified that he found the gun the next morning.

Ray Mosley, sheriff of Hancock county, testified that about 12:30 in the morning of November 3 he received a telephone call from Dr. Casey at LaHarpe telling him that he had accidentally shot and killed a friend and told the sheriff to come to his residence and to bring the coroner with him; that he did so, and that when he reached plaintiff in error's home he found him with his clothes in a grip and ready to go with him; that he showed the witness the bottom of the rubber boots he had worn, stating that one foot was on the running-board and that the car moved, causing his foot to slip and the gun was accidentally discharged. He testified Dr. Casey told him that night that

he had thrown the gun into some bushes as he went over to the hospital, and that he wanted him to find it because he feared that some child might find it, and that they went out to look for the gun but did not then find it. This witness also testified that the car driven by plaintiff in error and standing on his drive that night was a four-door small car; that he had examined the right-hand front door and there was no pocket on that door and it had the appearance of never having had a pocket there, and that there was nothing on the door that could hold a revolver or any other object.

It will be seen from this analysis of the testimony that but one witness for the State who, in testifying to the actual shooting, stated facts tending to indicate that the plaintiff in error intentionally shot the deceased. This was Lyle Landis. His testimony was, as we have seen, contradicted by more than one witness and its credibility impaired by his admissions concerning his testimony on material matters at the coroner's inquest. This was true, also, of Royal Landis' testimony. Lyle Landis' statement that neither he nor his brother told Dr. Casey at the hospital that they knew it was an accident and that they would stand by him is directly contradicted by the two nurses who were present and who are not shown to have any interest in the proceeding. The plaintiff in error then, and has since, consistently claimed that it was an accident and that he had no intention of shooting Peck. It is evident that Royal Landis was in such a condition that he did not remember much that took place, though he was willing to say on the trial that the act was deliberate. His testimony, however, does not show that he knew all that went on. The testimony of the two Landises is scarcely of the character to be depended upon to convince beyond a reasonable doubt. If their testimony before the coroner's jury was true plaintiff in error could not be proved guilty; if their testimony on the trial

was true their testimony before the coroner's jury could not have been the truth.

Counsel for plaintiff in error urges that the court erred in giving certain instructions to the jury. Instruction 2 is in substance the statute defining murder. Instruction 3 told the jury, as a matter of law, that malice is not confined to ill-will but is intended to denote an action flowing from any wicked or corrupt motive, and hence was implied from any deliberate or cruel act against another, however sudden, which shows an abandoned and malignant heart. The instruction further was, "and if the jury find from the evidence, beyond a reasonable doubt, that the defendant in this case committed a deliberate and cruel assault upon the deceased, Oliver Peck, however sudden, which showed an abandoned and malignant heart, then the jury would be warranted in finding that he committed such an assault with malice within the meaning of the law." Instruction 6 was an instruction on manslaughter. It is argued by counsel for plaintiff in error that these instructions are erroneous in that they omit reference to the defense of accidental killing, and counsel cites numerous cases where this court has held that where the defense is self-defense it is error to give an instruction as to what constitutes murder, and, in applying such instruction to the facts of the case, ignore the defense of self-defense. This rule does not apply where the defense is an accident. The existence of an accident is an entire negation of deliberate killing. The jury could scarcely have been misled by an instruction which told them that if they believed, beyond a reasonable doubt, that this defendant committed a deliberate and cruel assault upon the deceased which showed an abandoned and malignant heart they would be warranted in finding that he had committed such assault with malice, as that term is used in the law. Where the defense is self-defense the killing may be deliberate and intentional and yet be excusable on the ground of self-defense, but where the defense is an acci-

dent there can be no deliberate, intentional killing but the defense is just the opposite of those facts. In other words, the defense here is that there was no deliberate killing but that the killing was accidental. It was not error to give these instructions in this case.

It is objected that the instruction on manslaughter should not have been given because there was no evidence tending to support a manslaughter verdict. If the record contains any evidence upon which a manslaughter verdict might have been based it was not error to give this instruction. There was some such evidence. The giving of this instruction was therefore not erroneous.

An instruction was given on reasonable doubt, and counsel for plaintiff in error argues that it was prejudicial error. This court has many times stated that "reasonable doubt" needs no definition and that cases may well arise where an involved instruction as to reasonable doubt would result in prejudicial error. This instruction should not have been given. *People* v. *Schuele,* 326 Ill. 366; *People* v. *Rogers,* 324 id. 224; *People* v. *Johnson,* 317 id. 430.

Plaintiff in error complains of the fourteenth instruction, concerning the degree of credibility that should be accorded testimony of the defendant. It told the jury that they had a right to take into consideration the fact that the defendant was interested in the result of the prosecution as well as his demeanor and conduct upon the witness stand. The instruction further states: "And the jury may also take into consideration the fact, if such is the fact, that he had been corroborated or contradicted by credible evidence or by facts and circumstances appearing in evidence." This language is urged as error, and in support thereof counsel cites *People* v. *Washington,* 327 Ill. 152. In that case the jury were instructed that they could take into consideration whether the defendant had been corroborated "by other credible witnesses or facts and circumstances appearing upon the trial." Facts and circumstances appearing on the

trial may be facts and circumstances not appearing in evidence. The jury are not permitted, in weighing the testimony of a witness, to consider facts and circumstances appearing merely on the trial, since such might include outside matters, as outbursts or demonstrations by those present in no way connected with the case. Facts and circumstances appearing in evidence are proper to be considered in determining the credibility of a witness. This instruction was not erroneous. *People* v. *Maciejewski,* 294 Ill. 390; *People* v. *Zajicek,* 233 id. 198.

Instructions 10 and 11 are objected to. They are as follows:

10. "Even if you believe from the evidence that the defendant's daughter was out riding with Oliver Peck in his automobile, and the Landis boys and Mrs. Bradshaw were also riding in the same automobile, and they rode around LaHarpe and on the hard road to Dallas and Ft. Madison and stopped at different places, and beer and pop were purchased and alcohol was mixed with the beer and pop, and each of the parties drank repeatedly, and the two Landis boys and Oliver Peck and the defendant's daughter returned to her father's home about midnight and were all intoxicated, and the daughter was sitting between Oliver Peck and Lyle Landis and the defendant saw them at the time and became angry, still the defendant would not, under the law, be justified, if in possession of his mental faculties, in purposely shooting and killing Oliver Peck, if you believe from all the evidence, beyond a reasonable doubt, that he did shoot and kill him, in manner and form as charged in the indictment or some one or more counts thereof.

11. "The court instructs the jury that if you believe beyond a reasonable doubt that the defendant, while in full possession of his mental facilities, purposely shot Oliver Peck with a deadly weapon, in manner and form as charged in the indictment or some one or more counts thereof, on

the night of November 2, 1931, and that Oliver Peck died from the effects of such shot, then the fact, if it be a fact, that his daughter came home in an automobile in an intoxicated condition, with Oliver Peck and the two Landis boys, would not excuse the defendant or justify him in shooting Oliver Peck."

Counsel argues that these instructions are argumentative and ignore the defense of accident. The jury were told by instruction No. 10 that, notwithstanding the facts therein recited, the defendant, "if in possession of his mental faculties," would not, under the law, be justified in "purposely shooting and killing Oliver Peck." The instruction correctly states the law. If Dr. Casey was at the time in possession of his mental faculties, the facts recited in the instruction would not justify him in "purposely shooting and killing" the deceased. The State had a right to instruct the jury on its own theory of the case. The jury could not have been misled by this instruction, since it clearly limits the killing to "purposely shooting and killing" the deceased. The same is true of instruction No. 11.

Plaintiff in error argues that the court erred in refusing to give an instruction offered by him, telling the jury that the defendant's wife was not, under the law, competent to testify in the case. It is said that the fact that she did not testify might, in the absence of such an instruction, have been construed in a manner prejuicial to the interests of the defendant. Counsel in support of his contention cites *People* v. *Reno*, 324 Ill. 484. In that case the defense relied upon was alibi, the defendant testifying that he was at home with his wife at the time of the shooting. No one else could corroborate him. In this case, while the shooting occurred after the wife of plaintiff in error had returned to the house, yet there were facts in dispute, such as to what lights were burning on the Peck car, the condition of the plaintiff in error's daughter and her companions, as well as other disputed facts concerning which she could

have testified had she been permitted, under the law, so to do. The jury might well have misconstrued her failure to testify as being unfavorable to the plaintiff in error. It was error to refuse that instruction. This case is one very close on the facts as to whether the shooting was intentional or accidental. The principal evidence of the State depends upon the credibility of witnesses who were impeached in material particulars. In this condition of the record slight error in instructing the jury will require reversal. While a judgment of conviction resting on strong proof of guilt will not be reversed for slight errors in instructions, this is not such a case. This judgment should not be affirmed against plaintiff in error on this record.

The judgment will therefore be reversed and the cause remanded.

*Reversed and remanded.*

Mr. Justice Orr took no part in this decision.