(No. 23090

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JAMES AURIENE, Plaintiff in Error.

*Opinion filed October 24, 1935.*

Rocco DeStefano, and Nicholas A. Pope, for plaintiff in error.

Otto Kerner, Attorney General, Thomas J. Courtney, State's Attorney, and J. J. Neiger, (Edward E. Wilson, Henry E. Seyfarth, John T. Gallagher, and Richard H. Devine, of counsel,) for the People.

Mr. Justice Jones delivered the opinion of the court:

James Auriene, Frank DeSalvo, Sam Perry and James Sarantakis were indicted in the criminal court of Cook county for robbery with a pistol. The first three named were tried together by a jury, convicted and sentenced to the penitentiary. Auriene alone prosecutes a writ of error. His defense is an alibi.

On March 15, 1934, at about 1:15 P. M., five men in a Ford car drove into the alley of the Midwest Grocery Company, at Twenty-fourth street and Western avenue, in Chicago. Four of them, with drawn guns, entered the warehouse, held up the cashier, Harriet Ratkowski, and her assistant, Genevieve Rzeszewski, and escaped with about $738.

The testimony of Joseph Senski, assistant shipping clerk, tended to prove the following: He was on the rear

platform in the alley when a Ford sedan drove up. Four of the five men got out. He identified Perry, DeSalvo and Auriene as three of them. Auriene had a blue-steel pistol and the other two men had shot-guns. They forced him into the building, with Perry holding a shot-gun at his back. Auriene followed them. Twenty-two employees worked there. A number of them, including the witness and some customers, were lined up near a stairway during the hold-up, which took two or three minutes.

Ted Sejud, an assistant buyer, testified that he was on the shipping platform checking out groceries. Perry approached him with a sawed-off shot-gun and ordered him into the building, where he was forced to the wall with the other employees. Auriene was in the main aisle, about twenty feet away, and ordered them to keep in line and stood facing Sejud about a minute and a half. He had a handkerchief over a portion of his face and held a blue-steel revolver in his hand. DeSalvo had a shot-gun and ordered the employees to kneel and keep their heads down. The witness saw two other men with their faces disguised. One of them was named Antonelli and the other was James Sarantakis. Antonelli had a handkerchief on his face and Sarantakis had a black-silk scarf around his neck, which concealed the lower part of his face. About that time a receiving clerk started towards the office, and Auriene dropped his hand with the handkerchief from his face, gestured with his gun and ordered the clerk back into the line-up. Auriene then went into the office, passing within four feet of the witness. At the conclusion of the hold-up the robbers ran out of the building. Auriene carried the cash drawer.

Genevieve Rzeszewski testified she and Harriet Ratkowski were in the cashier's cage at the time of the robbery. Auriene came into the cage with a blue-steel revolver, took about $400 from her and about $338 from Miss Ratkowski. The lower part of his face was covered with a

handkerchief tied at the back. While he was in the cage he dropped his gun, and as he stooped to pick it up the handkerchief dropped down and she had a good view of his full face. He replaced the handkerchief and opened the money drawer. She saw some tape on the handle of his revolver as he held it in his hand. Over objection she testified the gun found by a police officer when Auriene was arrested was of the same color and general appearance as the gun she saw in the cashier's cage. The gun introduced in evidence had tape on the handle.

Senski testified defendant had on a blue serge suit, green fedora hat, dark lumber jacket and no overcoat. Sejud testified he had on a dirty pearl-gray felt hat and a dark gray top-coat and was five feet nine or ten inches tall. After the hold-up Sejud told his "boss" that Auriene was about five feet ten inches tall, weighed between 150 and 160 pounds, was dark complexioned, and had a large hook-nose and dark hair. He wore a hat but his hair could be seen. The car in which the men came was a 1932 two-door dark-maroon Ford coach, with yellow wheels. Miss Rzeszewski testified Auriene had on a gray hat and a dirty tweed overcoat. He was five feet nine or ten inches tall and weighed about 155 or 160 pounds. On March 26 she gave the officers the same description of his hat and coat and told them he had on a dark suit, white shirt and collar. The top-coat was not buttoned.

Immediately after the robbery three police officers arrived, interviewed eight or ten witnesses and made a report, in which one of the robbers was described as "24, 5 foot 11, 150 pounds, slim, dark-gray overcoat, gray hat, nickel-plated revolver." Another of them was described as "140, dark complected, dark lumber jacket, dark-gray cap, glasses, blue-steel revolver." The car was described as a black Ford sedan, license No. 500620. Officer Collopy testified the witnesses were all talking together, and he could not say which one gave him any of the descriptions.

Senski testified that he next saw the robbers at a show-up at the detective bureau on March 29, in company with Senski and Miss Rzeszewski, who testified that the visit to the detective bureau was on March 26. All three of them testified that there were from seven to nine men in the show-up line. Auriene testified there were six others with him. None of the witnesses said anything in the presence of defendants.

Auriene was arrested between 9:00 and 9:30 P. M. on March 23, 1935, by police officers Strecke, Sprague and Smunsky. Strecke testified that they were cruising in a squad car and saw a Ford V-8 going at high speed. The siren on the police car was sounded but the Ford did not slacken its speed. The officers fired a couple of shots and then the Ford ran into a tree and stopped. When the officers came up Perry was inside the car, and Auriene was sitting on the running-board with the loaded revolver between his knees. Sprague testified that as the police car stopped the revolver dropped into the gutter. Auriene testified that when the police car came up he was standing near his car. He denied having possession of the revolver and testified that it was not picked up near the place where he stood. He denied being at the scene of the hold-up or that he was in company with Perry or DeSalvo at that time and denied knowing Sarantakis or Antonelli. He owned a 1933 dark-maroon Ford Victoria coupe, with cream-colored wheels, license number 594451.

In support of Auriene's alibi, Roy Rollins, who lived next door to defendant, engaged in general repair work on automobiles and as a millwright and other work, testified that on March 15, about 8:00 A. M., Auriene asked him to do some plumbing work for his uncle, Louis Ozzanto. They arrived at Ozzanto's house about 8:45, took some measurements and did certain plumbing work. The work was finished some time after 2:00 o'clock, and then the men had lunch and left about 4:00 o'clock. Auriene was

there all the time. Ozzanto testified that on the previous evening he asked Auriene to help him and to bring someone to install the pipe. He corroborated Rollins' testimony, and there was introduced in evidence a bill for the pipe and some fittings from the Gordon Hardware Company, dated March 15. Auriene testified similarly, but said they left the Ozzanto house at 3:00 o'clock.

Sam Gordon, a clerk who made out the bill for pipe and fittings introduced in evidence, testified that on the day prior to his testimony (June 28) he examined the pipe and fittings in the basement of the Ozzanto house. The pipe and fittings he found there did not look like the ones described in the bill. They were old and rusty.

The sufficiency of defendant's identification is questioned because Senski testified he wore a green hat and a dark lumber jacket, while Sejud and Miss Rzeszewski testified he wore a gray hat. Both described his top-coat as gray or a dirty tweed.

It is urged that Sejud identified Sarantakis as one of the robbers, when, as a matter of fact, Sarantakis was in jail at the time of the robbery. It is also contended that Sejud testified Auriene had a large hook-nose, dark hair and was dark complexioned, and that he is contradicted by the other witnesses. Sejud's testimony is attacked as being intentionally false in these particulars and therefore all of his testimony should be disregarded. Discrepancies in the testimony of an identifying witness tend to weaken it, but, after all, its weight, taking into consideration such discrepancies, is in the first instance a question for the jury, and in the absence of such differences as demonstrate that the finding is against the manifest weight of the evidence this court will not substitute its opinion for that of the jury. (*People* v. *Manfucci*, 359 Ill. 69.) The countenance of one may become indelibly fixed in the mind of an observer while the details of dress may be unnoticed or forgotten. The descriptions of Auriene's hat and coat by Sejud and

Miss Rzeszewski are substantially alike. They had an opportunity to observe his face, uncovered, during the progress of the robbery. The record indicates that Sejud was honestly mistaken as to Sarantakis being present. His statement to Miss Rzeszewski at the detective bureau that he was not sure Auriene was the man who took the money was made on March 26, on the occasion of their first visit to view the men accused of the robbery. He saw him two or three times after the 26th. While no other witness described Auriene's nose, hair and complexion, nobody disputed Sejud's description of them, and it is not claimed that it is not correct.

On cross-examination Miss Rzeszewski testified that Anderson, the agent of an insurance company, told the witnesses they were going to the detective bureau to identify the boys who were arrested. In response to the question, "So you could testify he was the man that held you up?" she answered, "Yes." She then testified that Anderson told them they were going to a show-up to see certain people and to see if they could identify the boys. She was not told Auriene was there before they went up-stairs. Defendant testified that there were six other men in the show-up line. The testimony does not indicate that any of the witnesses were influenced to pick out Auriene or that any suggestion was made to any of them as to his identity. The jury saw and heard the witnesses for the People and as to the alibi. It was for them to determine the weight to be given the testimony. The fact that there is some conflict and discrepancy in the evidence as to the identity of the robbers and some testimony to support an alibi, does not of itself, in the face of positive identification, require a reversal, and an identification by but one or two witnesses, if sufficiently certain, is enough to sustain the verdict. (*People* v. *Gasior*, 359 Ill. 517; *People* v. *Matthews*, 359 id. 171; *People* v. *Manfucci, supra.*) Defendant was positively identified by all three of the People's witnesses.

After considering the evidence we are of the belief that the identification of defendant is not so uncertain as to warrant our reversing the finding of the jury.

When arrested the defendant had a revolver of the kind used in the hold-up. It was properly admitted in evidence. (*People* v. *Dale,* 355 Ill. 330; *People* v. *Powloski,* 311 id. 284.) Jesse Harris testified he saw the revolver in the office of the Eastern Coal Company on November 26, 1933, where it was kept under a scale book. No objection was raised until after the witness had testified. The testimony was then stricken on motion of defendant's counsel and the jury was instructed to disregard it. We do not perceive that defendant suffered any prejudicial error.

The court instructed the jury that "the defendants are presumed to be innocent of the charge in the indictment and this presumption remains throughout the trial with the defendants until you have been satisfied by the evidence in the case beyond all reasonable doubt of the guilt of the defendants." Instructions of the same import were approved in *People* v. *Rongetti,* 331 Ill. 581, and *People* v. *Collins,* 332 id. 222.

An instruction defining reasonable doubt was given. We have often criticised this practice, as "reasonable doubt" needs no definition. The claim that the instruction as given does not refer to a reasonable doubt arising from a consideration of all the evidence is without merit.

Auriene complains of the refusal to give an instruction which by its terms was applicable only to Frank DeSalvo, who is therein named. He is not concerned with DeSalvo's defense, and if there was any error in refusing the instruction DeSalvo alone could complain.

Defendant had a fair trial, and the judgment of the criminal court is affirmed.       *Judgment affirmed.*