(No. 31449.—

The People of the State of Illinois, Defendant in Error, *vs.* John Peter Maffioli, Plaintiff in Error.

*Opinion filed May 18, 1950—Rehearing denied September 18, 1950.*

Max A. Weston, and Donald M. Keenan, both of Rockford, for plaintiff in error.

Ivan A. Elliott, Attorney General, of Springfield, and Robert R. Canfield, of Rockford, (Dale F. Conde, and H. Emmett Folgate, both of Rockford, and Harry L. Pate, of Tuscola, of counsel,) for the People.

Mr. Justice Wilson delivered the opinion of the court:

In a trial before a jury in the circuit court of Winnebago County, the defendant, John Peter Maffioli, was found guilty of burglary with intent to commit rape and sentenced to imprisonment in the penitentiary for a term of from two to ten years. Seeking a reversal, defendant prosecutes this writ of error.

The following facts are disclosed by the record. On the night of August 9, 1947, the complaining witness, Franceen Conrad, a married woman thirty-seven years of age, was at home alone, her husband being away on business, and went to sleep in a bedroom at the front of their one-story house in Rockford. Awakened by a noise about two o'clock in the morning, she turned on a light in the front yard, investigated, saw nothing unusual, and had just returned to bed when she heard a voice say, "I am coming in. Don't move or call the police or I will shoot." Thereupon, she rushed through the den into the living room where she dialed the operator and asked her to notify the police. In the bright moonlight and artificial illumination from a night light in the den she saw a tall, slender stranger,

with a grown out bush haircut and a limp or unnatural gait, dressed in a white T-shirt and light tan trousers, with a towel over the lower part of his face, follow her into the living room. The intruder grabbed her with his left hand, unbuttoned his trousers with his other hand, indicated a davenport and said, "Lie down, senorita," asking, in almost the same breath, "Did you call the police?" Mrs. Conrad broke away from her assailant and, screaming for help, ran out on the terrace in front of the house, where she met Mrs. Ruth Keeler, her next door neighbor to the south. A few moments later, her assailant, now unmasked, followed her out the front door. Mrs. Conrad did not turn around to look at him as he ran across the lighted front yard, stopped to look back, and then ran slowly past the front and down the side of the adjoining corner house to the north, where he entered a dark-colored sedan or coupe and drove away.

Although the window in Mrs. Conrad's bedroom was only three feet from the ground, an investigation revealed that a log had been placed beneath the window. Entrance had been gained by tearing away the screen on the open window.

In addition to Mrs. Keeler, Mrs. Susan Griggs, who lived in the first house north of the complaining witness, and John Lightcap, who resided directly across the street, also witnessed the escape. Mrs. Conrad identified defendant as her assailant and Mrs. Keeler testified he was the same man who rushed past her across the lawn and stopped to look back before continuing his flight. Both these witnesses related they originally identified defendant on August 30, 1949, first from police photographs, and then in person in a courtroom. The photographs were admitted in evidence over defendant's objection. Mrs. Conrad stated defendant had the same peculiar gait as her assailant, but admitted she revisited the police station, once, to view other suspects.

Mrs. Griggs agreed with Mrs. Keeler that the man in question ran slowly and, although able to describe him as being about five feet, ten inches tall, very slender, without glasses, dressed in a white T-shirt, and khaki trousers, said she did not see him well enough to identify him. Lightcap, a former police officer and the only eyewitness appearing for defendant, stated that the man ran fairly rapidly but did not appear to be in much of a hurry, that he could not tell whether the person running was lame, and that he could not say for sure that defendant was the man he saw. No witness reported seeing a gun and it was generally agreed that the assailant was not wearing glasses.

The evidence for defendant discloses that he lived with his parents in a house about ten blocks from the scene of the crime, was twenty-seven years of age, and attended a local business college. As a result of an operation in May, 1948, on his left hip, deformed from birth, he has no motion in the hip and only limited flexation in his left knee. According to defendant and his parents, he is unable to get in or out of a bath tub or to put on his shoes, socks and trousers without assistance. He stated that he could only enter an automobile by pushing himself in backwards with his good leg but that he was able to drive and frequently used his father's dark green 1938 Chevrolet coupe, to which he carried a set of keys. Dr. Samuel Behr, the operating surgeon, testified that defendant does not have a marked limp, that he could run but would have a marked hitch and be slower than most persons, and that it would be difficult for him to climb into a window three feet from the ground. According to defendant, he never ran in his life. In addition, he and his parents stated that he had worn glasses all the time for many years and could not see without them.

From the testimony of a minister and two neighbors, all of whom had known him a long time, it appears that

defendant bore a good reputation as a law-abiding person and attended church regularly.

The principal defense consisted of a denial of the offense charged, coupled with an alibi. Defendant testified that, on August 9, 1949, he wore a white T-shirt and yellow corduroy trousers and his hair was cut in the manner shown in the police photographs (about two inches long and standing straight up;) that, after returning home from a hayride, he was sent to a drugstore, just before ten o'clock, for oil of cloves for his father, who was suffering from a very severe toothache; that he helped his mother can corn and tried to make his father more comfortable until eleven o'clock when he changed into his pajamas and went to bed; that he could not sleep and arose about one-thirty and, again, at two-thirty, to see how his father was; that his mother finished canning corn about two-thirty; that he last saw his father about a quarter to four when they all fell asleep, and that he did not leave the house from ten o'clock in the evening until he left for school the following morning.

Defendant's purchase of oil of cloves for his father was corroborated by the druggist who served him. In addition, both his parents stated that defendant was always very upset when either one of them was sick, that he was up frequently until about three-thirty; that they would have seen him if he left the house; that they did not hear either of the family cars start during the night, and that their son did not leave the house after ten o'clock and was at home all night. Although Mrs. Maffiioli testified defendant talked to her about every twenty minutes while she was canning corn in the kitchen and was in bed when she retired shortly after two-thirty and her husband related that, being unable to sleep because of his toothache, he spent most of the night sitting up in the dining room, and that not only did he see defendant out of bed frequently, but defendant would

have to pass through the dining room in order to leave the house, neither testified to seeing defendant at any specific time, except at two-thirty, and, in particular, neither said they saw him between one-thirty and two-thirty in the morning.

Seeking a reversal of the judgment of conviction, defendant first contends the evidence is insufficient to show a burglary was committed. Burglary consists of entering, with or without force, any dwelling or other building, either in the daytime or the nighttime, with intent to commit a felony or larceny. (Ill. Rev. Stat. 1949, chap. 38, par. 84; *People* v. *Brown,* 397 Ill. 529.) The gravamen of the offense is the felonious intent with which the building is entered. (*People* v. *Glickman,* 377 Ill. 360; *People* v. *Myler,* 374 Ill. 72.) In the instant case, it was, of course, incumbent upon the prosecution to prove that defendant entered the home of the complaining witness with the intention of committing rape. The felonious intent of an accused may be inferred from his words, action, violence and other conduct and it is within the province of the jury to consider all the facts and circumstances of the case in determining the question of intent. *People* v. *Niksic,* 385 Ill. 479; *People* v. *Geisler,* 348 Ill. 510.

Defendant admits the intruder, "whoever he may have been," was guilty of lascivious conduct but contends that the proof falls far short of showing that rape was intended. Rape is the carnal knowledge of a female, forcibly and against her will. (Ill. Rev. Stat. 1949, chap. 38, par. 490; *People* v. *Celmars,* 332 Ill. 113.) The act of the intruder in breaking into the bedroom of a woman known to be awake, and his indication of the davenport, accompanied by a command to lie down, and followed by the unbuttoning of his trousers, clearly bespeak an intention to have intercourse. Furthermore, the circumstance that the intruder, after breaking into the bedroom with a threat to shoot, engaged in conduct of this character with a respectable

married woman, a stranger to him, at two o'clock in the morning, while holding her by force, and, in utter disregard of a well-founded suspicion she had already called the police, evidences his intention to accomplish his purpose forcibly and against the will of his victim, and we are satisfied that intent to rape was established beyond reasonable doubt.

Defendant next contends the evidence is insufficient to sustain his conviction as the person who perpetrated the crime. Mrs. Conrad positively identified defendant as her assailant. Mrs. Keeler was equally firm in her identification. In addition, it was shown that defendant could only climb with difficulty, thus explaining the log beneath Mrs. Conrad's window, that he had a stiff hip and could not run fast, thus conforming with the testimony of all eyewitnesses that the assailant escaped running slowly, and that he was five feet, ten inches tall, slender and wore a white T-shirt and yellow or light tan trousers on the night in question, thus filling the description given by the three eyewitnesses for the prosecution. The circumstances under which Mrs. Conrad and Mrs. Keeler had an opportunity to see the assailant, that he was first identified from photographs, that Mrs. Conrad subsequently viewed other suspects, the testimony that he wore glasses all the time and could not see without them, his doctor's testimony that he could only run with a marked limp, the testimony as to his good character, and the evidence that he did not leave his home after ten o'clock in the night in question, were simply facts and circumstances to be taken into consideration by the jury, together with all the other facts, in determining the question of guilt. In this connection, it should be observed that not only is defendant's alibi somewhat unusual, but also there is a gap between one-thirty and two-thirty, the exact time of the crime, when it does not appear that he was seen by either of his parents. Defendant complains particularly because he was originally identified from police photographs. The record is silent as to whether de-

fendant was identified from photographs of himself, alone, or from the photographs of a number of suspects. The method employed to identify a defendant merely affects the credibility of the witness. (*People* v. *Barry*, 371 Ill. 463; *People* v. *Kidd*, 357 Ill. 133.) The jury saw and heard the witnesses as to identification and as to the alibi, and it was for it to determine the weight to be given to the testimony. (*People* v. *Leach*, 398 Ill. 515; *People* v. *Bloom*, 370 Ill. 144.) Although the identifying witnesses did not observe the intruder under highly favorable conditions and there was evidence of an alibi, this does not, in the face of positive identification, require a reversal, and the identification, being certain and credible, is sufficient to sustain the verdict. *People* v. *Auriene*, 361 Ill. 440; *People* v. *Gasior*, 359 Ill. 517.

Defendant's remaining contentions relate to rulings on evidence and to two instructions. He first complains that the admission of the photographs from which he was originally identified, each bearing the legend, "Police Dept., Rockford, Ill. 6874 John Maffioli 8-26-49" was prejudicial because the photographs constituted evidence of other crimes. The photographs were not received in evidence for the purpose of showing an arrest for another offense, but were properly admitted as the photographs from which defendant was first identified by eyewitnesses to the crime charged. In addition, the photographs were relevant to the material issue of defendant's style of haircut and general appearance in August, 1949. Other contentions made and argued with respect to the admission of evidence have been carefully considered and found to be similarly without merit.

Defendant further complains of an instruction informing the jurors that, if the defendant has been proved guilty beyond a reasonable doubt, they should not acquit him merely because it was possible that he was innocent, and that the prosecution is not required to prove guilt beyond the possibility of a doubt. The instruction, although not

misleading, constitutes an attempt to define reasonable doubt, a term needing no elaboration, and should not have been given. (*People* v. *Schuele,* 326 Ill. 366; *People* v. *Rogers,* 324 Ill. 224.) While cases may well arise where an involved instruction as to reasonable doubt would result in prejudicial error, (*People* v. *Casey,* 350 Ill. 522,) an instruction of this character does not require a reversal. (*People* v. *Davis, ante,* p. 215; *People* v. *Baker,* 365 Ill. 328.) Under the circumstances of the present case, we are of the opinion that the instruction given did not result in prejudicial error.

Lastly, defendant contends the court erred in refusing to give an instruction telling the jurors that if there were two theories which may lawfully be drawn from the evidence, one pointing to guilt and the other to absence of guilt, they should find defendant not guilty. The instruction is applicable only when opposing theories as to guilt or innocence arise out of the same facts. In the present case, the respective theories advanced by the prosecution and the defense arose out of wholly unrelated facts, and the instruction, being without foundation in the evidence, was properly refused. *People* v. *Johnson,* 317 Ill. 430.

The judgment of the circuit court of Winnebago County is affirmed.

*Judgment affirmed.*