(No. 35294.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* SAM URBANA, Plaintiff in Error.

*Opinion filed November 18, 1959—Rehearing denied Jan. 18, 1960.*

RICHARD H. DEVINE, of Chicago, for plaintiff in error.

GRENVILLE BEARDSLEY, Attorney General, of Spring-field, and BENJAMIN S. ADAMOWSKI, State's Attorney, of

Chicago, (FRED G. LEACH, and WILLIAM H. SOUTH, Assistant Attorneys General, and FRANCIS X. RILEY, and EDWIN A. STRUGALA, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE DAVIS delivered the opinion of the court:

The defendant, Sam Urbana, prosecutes this writ of error to reverse the judgment of the criminal court of Cook County finding him guilty of the crime of attempted burglary. He was tried before the court and, after post-trial motions were denied, was sentenced to the penitentiary for a term of not less than one nor more than five years. The errors assigned and argued relate to the propriety of the indictment and the legal sufficiency of the evidence to sustain the judgment of conviction.

Defendant contends that he was indicted under section 1 of division II of the Criminal Code, (Ill. Rev. Stat. 1955, chap. 38, par. 581,) and that the crime of attempted burglary is defined and made punishable only under section 37 of division I. (Ill. Rev. Stat. 1955, chap. 38, par. 85.) He points out that section 1, the general attempt statute, provides for the punishment of an attempt to commit an offense prohibited by law where no provision is made for the punishment of such attempt. He argues that since section 37 specifically provides the punishment for attempted burglary, the charge against him could properly be made only under it; and that the judgment based upon an indictment under the general attempt statute cannot be sustained.

Section 1 provides: "Whoever attempts to commit any offense prohibited by law, and does any act towards it but fails, or is intercepted or prevented in its execution, where no express provision is made by law for the punishment of such attempt, shall be punished, when the offense thus attempted is a felony, by imprisonment in the penitentiary not less than one, nor more than five years; in all other

cases, by a fine not exceeding $300, or by confinement in the county jail not exceeding six months."

Section 37 provides: "Whoever shall attempt to break and enter any building, ship or vessel, with intent to commit the crime of murder, rape, robbery, larceny or other felony, shall be imprisoned in the penitentiary not less than one nor more than five years." Prior to amendment in 1953, it was restricted to attempts to break and enter "in the night time" but those words were then deleted.

Before such amendment there was no statute specifically providing for the punishment of burglary attempted in the day time. Under this posture of the statutes, we held that section 1 which provides for the punishment of attempts generally was applicable and that any person who attempted a day time burglary could be indicted and convicted thereunder. *People* v. *Lebolt,* 5 Ill.2d 399.

However, in a case decided prior to the amendment of section 37, we held that an indictment under section 1 was improper where the evidence showed that an attempt had been made to break and enter in the night time, since there was an act specifically providing punishment for an attempted night time burglary. *People* v. *Jones,* 263 Ill. 564.

Since the 1953 amendment, section 37 is applicable to attempted burglary, whether committed in the day or night time. It contains a specification for the punishment of attempted burglary, while section 1 covers the punishment of attempts only where no provision is otherwise made therefor.

Defendant's argument is based upon the assumption that the indictment in this case was drawn under section 1. In substance, the indictment provides that Sam Urbana on July 1, 1956, in Cook County, Illinois, "unlawfully * * * did attempt to break and enter a certain building, to-wit: store of the Jewel Tea Co., Inc., a corporation, there situate, with intent the personal goods, chattels, money and property of said Jewel Tea Co., Inc., in said certain building,

\* \*· \* then and there feloniously and burglariously to steal, take and carry away, \* \* \* and in said attempt did then and there do certain overt acts toward the commission of said offense, to-wit, did then and there break and cut the grill on a certain back door and did then and there drill the tumbler of the lock on a certain inner door to the end that Sam Urbana might then and there feloniously and burglariously enter said building, to-wit: store and said Sam Urbana did fail in the perpetration of said offense and was intercepted and prevented in the perpetration of the same."

While the indictment is verbose and contains language customarily employed in charging a crime under section 1, it does not follow that it is therefore bad under the provisions of section 37. An overt act, failure, interception or prevention in the execution of the crime are factors inherent in the general legal concept of an attempt. When an indictment charges an attempt it is proper to specify what acts were done and the reason for failure to execute the crime intended. Since the indictment is legally sufficient under section 37, there is no reason to assume or hold that it was improperly brought under section 1.

It is also claimed that the evidence did not establish defendant's guilt of the crime charged beyond a reasonable doubt. In this connection, defendant questions the proof concerning his identification. In a criminal case it is incumbent on the People to prove beyond a reasonable doubt not only the commission of the crime charged but also to establish by the same degree of proof the perpetration of the crime by the person accused. (*People* v. *Davis,* 14 Ill.2d 196; *People* v. *Kidd,* 410 Ill. 271.) There can be no doubt in this case that a burglary was attempted at the time and place in question. The only issue to be decided is whether it was proved beyond a reasonable doubt that the defendant was one of the persons who committed the offense.

The evidence established that on June 30, 1956, a store building owned by Jewel Tea Co., Inc., a corporation, was located at 2919 on the east side of N. Harlem Avenue in the city of Chicago. Harlem Avenue runs north and south and the store building was about 100 feet wide and extended backward from the building line on Harlem to an alley which runs north and south along the rear or east side of the premises. Wellington Street is the first street north of the store and runs in an east and west direction. The property between the north wall of the store and Wellington was vacant. A parking lot bounded on the west by Harlem Avenue and on the east by the alley, used by the patrons and employees of the store, was located south of the store building and extended to George Street, the next east and west street. Thus, the store was the only building in the entire half-block area.

North Neva Avenue is the next north and south street east of Harlem. The homes on the west side of that street abutted upon the alley at the rear of the Jewel store. At the time in question, Kenneth Nichols and his family occupied a two story residence at 2922 North Neva Avenue. The lot on which the house was located was 33⅓ feet wide and extended to the alley. There was a small back yard and a garage at the rear of the house. The Nichols property was directly across the alley from the Jewel Tea Co. store building. An upstairs bedroom window located at the rear of the Nichols house afforded a view of the back of the Jewel Tea store and the alley. This bedroom was used at the time by Janet Nichols, a daughter of Kenneth Nichols.

There was a rear entrance to the Jewel Tea store located in the east wall about five or six feet from the northeast corner of the building. The east wall itself extended along the building line of the alley but the entrance in question was recessed into the building about three or four feet. The north and south walls of this recess were a continuation of

the brick used in the construction of the east wall itself. Solid steel double doors were located on the inside of the brick doorway of the recess and gave access to the building proper. They were equipped at the time with a snap cylinder or tumbler lock which could be opened from the outside only by using a key.

Double folding steel gates were installed at the outer edge of the recess flush with the east wall of the building and extended upward to the full height of the opening. These gates were made of criss-cross bars of flat steel, riveted and fabricated in such manner that each section could be folded from the center toward the wall and then swing inward. They could be secured by a padlock which would fit into a hasp in the center, thus joining the two sections when closed. The apertures between the bars of these sections when closed were large enough to permit a person to reach through from the inside and attach the padlock through the hasp on the outside of the gates.

A conduit extended from the east wall above the gates and a light fixture, consisting of a bulb, socket and metal reflector, was attached. This fixture was about two feet from the wall and the reflector was tilted down and inward so that when the bulb was illuminated the light shined on an area in the alley and part way into the recess.

The assistant manager testified that at about 6:30 P.M. on Saturday, June 30, 1956, he closed the steel gates at the northeast entrance and reached through from the inside and secured a heavy steel padlock in the outside hasp; that he locked the double steel doors; and that when he left the store all doors and windows were securely fastened.

Both the manager and assistant manager testified that they were called to the store some time after 2 A.M. on Sunday, July 1; that they found a large number of people in the parking lot and alley outside the store, including several policemen; that the gates at the northeast alley entrance were open and the hasp and lock broken; and

that a hole had been drilled in the cylinder of the lock on the steel double doors and a drill bit had been broken off in the hole.

Miss Nichols testified that she had been out on a date and returned home early in the morning on Sunday, July 1. She looked out her bedroom window and saw a man seated at the low step at the northeast alley entrance to the Jewel Tea building. His feet were in the alley and the light above him was on so she could see him clearly at a distance which was stipulated at the trial to be about 110 feet. She noticed that the steel gates were open and had been pushed back. She turned out the light in her room and then called her father.

They observed that the man seated in the doorway reached backward from time to time as though to hand something to someone behind him. They were unable to see far enough into the recess to determine whether another person was there. The man at the alley entrance got up and walked about several times, and on one occasion he walked to the northeast corner of the building and looked west toward Harlem Avenue. Nichols described the man as being about 5 feet, 8 or 9 inches tall, with dark, short, bushy hair. Miss Nichols testified that he was white and had a fairly large nose and jutting chin; and that his hair was fairly long, dark and curly. Both testified that he wore a dark shirt with white stripes and dark trousers and shoes. At the trial they both identified the defendant as the man they had observed near the store building on July 1, 1956.

Nichols left the bedroom long enough to call the police. In a short time he and his daughter saw this man step quickly into the recess. He emerged almost immediately with another man and they ran north in the alley. As the men ran, the Nicholses heard shouts and shots were fired, whereupon they went to the alley. Nichols testified that a few minutes later a car was driven into the alley from the north; that one of the police officers present asked him if

he could identify the man seated in the back seat as the man he had seen at the rear entrance of the store building; and that he identified defendant as that man. It was Nichols's recollection that defendant was taken out of the car for better observation and that his daughter was present at the time.

Miss Nichols, a college student, testified that she saw defendant seated in the back of a police car parked in the area south of the store building; that an officer in plain clothes, whom she did not know, was seated in the driver's position; and that, at his request, she entered the car, viewed defendant, and identified him as the man she had previously seen at the door of the store. It was her recollection that her father was not present at the time and that defendant did not get out of the car.

William Hall, a police officer, testified that in response to a call received at their station at about 2 A.M. on July 1, 1956, he, officer Sage and sergeant Fergus drove to the Jewel Tea store in squad car 216 and parked on North Harlem Avenue in front of the building; that Sage remained in the car, and he and Fergus ran across the parking lot to the alley; that they saw two men run to the north and thence in a northwesterly direction in the vacant lot; that they shouted that they were police officers, ordered the men to halt and fired warning shots, but the men continued their flight; and that they went to the middle of the vacant lot but could see no one.

Hall further testified that squad car 448, manned by police lieutenant Charles Hopp and sergeant Raymond Venn, left the station at the same time as squad car 216; that it passed their car and parked further north on Harlem; and that he had been in the vicinity of the alley only a few minutes when squad car 448 entered the alley from the north and the defendant was in its rear seat.

Officers Venn and Hopp were called as witnesses by the defendant. Venn testified that squad car 448 was parked

in the alley behind the Jewel Tea store at about 2:15 A.M. on July 1. At that time the defendant, who had been apprehended, was in the back seat. Both he and Hopp were also in the car. Venn asked both Miss Nichols and her father to look at this man. The witness further testified that Miss Nichols said that the defendant looked like the man she had seen and called attention to the fact that he "had a dark shirt on with white stripes going across." Venn related that Miss Nichols did not then say that she recognized the man's face and it was his opinion that she identified him from his clothing rather than from his features. He denied that Miss Nichols got into the squad car and stated that he ordered defendant out of the car so that she might observe him.

On cross-examination Venn said that defendant was about 5 feet 7 inches tall and weighed about 150 pounds; that his hair was black and that he combed it back pompadour style. He also stated that on the morning in question defendant wore dark trousers and a dark shirt with horizontal light stripes. Although he testified on direct examination that both Miss Nichols and her father had been asked to identify defendant, he admitted on cross-examination that he had not asked the father to do so. It was his recollection that Nichols said nothing. Venn and Hopp took defendant to the police station in a squadrol.

Lieutenant Hopp testified that Miss Nichols and her father were near the squad car when the defendant was taken out for the purpose of identification; and that Miss Nichols then said that his shirt and trousers were the same as the man she saw at the door of the store, but that she did not say he was the man she had seen there. He further testified that he did not hear Nichols say that this was the man but admitted, on cross-examination, that he had not asked Nichols whether he could identify him. He stated that defendant had been in his custody for about ten minutes

prior to the time Miss Nichols saw him and that they had been in the alley two or three minutes prior thereto.

The defendant testified briefly. He denied that he sat in the doorway at the Jewel Tea store on July 1, 1956, and that he had broken the lock off the gates or drilled the lock in the door. On cross-examination he admitted that he lived about four and one-half miles west of the store.

From the foregoing, the question arises whether the testimony of the identifying witnesses, together with the other facts and circumstances in evidence, is sufficient to establish the guilt of the defendant beyond a reasonable doubt. The testimony of one witness as to identification, if positive and the witness credible, is sufficient to convict even though the testimony is contradicted by the accused. *People* v. *Burts*, 13 Ill.2d 36; *People* v. *Williams*, 12 Ill.2d 80; *People* v. *Wilson*, 1 Ill.2d 178.

At the trial, both Nichols and his daughter positively identified defendant as the man they had seen at the rear entrance of the store. Though each was subjected to an extensive and rigorous cross-examination, it did not shake the certainty of this identification. Discrepancies between the testimony of Nichols and Janet as to where each viewed the defendant after his arrest, whether alone or together and whether in or out of the squad car are stressed. Defendant also claims that the testimony of officers Venn and Hopp shows that Nichols entirely failed to identify the defendant on the morning in question.

However, the testimony of Venn and Hopp amounts only to this: that they did not hear Nichols identify the defendant and both admitted that they did not ask him to do so. On the other hand, Nichols testified that it was his recollection that sergeant Fergus was the officer who asked him to look at defendant and that he made his identification in the presence of Fergus, though he could not be sure. According to the uncontradicted testimony of

officer Hall, Fergus was there. At the time of the trial, Fergus was retired, was living in Florida and did not testify.

It is entirely reasonable to conclude that Nichols did identify the defendant to Fergus and that neither Hopp nor Venn heard him do so. The inevitable confusion resulting from such situation can well explain differences in the testimony of the witnesses, especially when the question of who told what to whom is involved in a trial taking place nearly two years after the occurrence. Any apparent discrepancies between the testimony of Nichols and his daughter are more apparent than real. Both Nichols and his daughter were able to observe the man in question at a distance of about 110 feet in a good light for a considerable period of time. Their description of the man they saw at that time, including his physical characteristics and the clothing he wore at the time of his arrest, is almost a replica of that given by sergeant Venn.

While there is no direct testimony in the case concerning the exact place or circumstances of defendant's apprehension, the undisputed fact is that he was brought into the alley behind the store in the custody of officers Venn and Hopp within a few minutes after the two men were seen in flight from the rear of the premises. Though he denied participation in the attempted burglary, defendant entirely failed to explain his presence in the vicinity of the crime which the evidence shows took place after midnight in a location about four and one half miles from his home.

A person accused of a crime is not required to prove his innocence or even to testify in his defense. When he does so, however, his testimony must be considered and weighed according to the same rules which are applicable to the testimony of any other witness. In view of the evidence against him, we cannot say that the defendant's testimony even tends to raise a reasonable doubt of his guilt, while

the testimony of the witnesses for the People was sufficient to establish it as required by law.

Where the trial judge is the arbiter of the facts as well as the law, due regard must be given to the opportunities of observation enjoyed by him and to his judgment based thereon. The judgment of the trial court should not be set aside unless it can be said that the proof is so unsatisfactory as to justify a reasonable doubt of defendant's guilt. (*People* v. *Crenshaw,* 15 Ill.2d 458; *People* v. *Davis,* 14 Ill.2d 196.) There is no such doubt in this case.

Defendant's final contention is that the evidence, if it establishes anything, proves that he is guilty of the crime of burglary, in which case he could not be convicted of the crime of attempted burglary. He takes the position that attempted burglary is not a lesser offense necessarily involved in the greater offense of burglary, but rather is a separate and distinct crime; and that since the folding gates were broken open and someone entered the recess of the building, the crime of burglary was committed. He cites no authority for this position.

The statute defining burglary requires the entry of a building, with or without force, with a felonious intent. (Ill. Rev. Stat. 1955, chap. 38, par. 84.) The essence of the crime is the entry of a building with such intent. (*People* v. *Stanton,* 16 Ill.2d 459; *People* v. *Hansen,* 5 Ill.2d 535; *People* v. *Maffioli,* 406 Ill. 315.) The only entry in the case at bar was into the small areaway or recess. This was not the purpose of the parties involved. The locked steel double doors still barred access to the building itself. The evidence shows an abortive attempt to enter the building through these doors and affords the best demonstration that there was no entry in fact. The perpetrators were still engaged in an attempt to enter the building when they were frightened away. A hole had been drilled in the lock but an entry had not been effected.

The elements necessary to establish the *corpus delicti* of the crime of attempted burglary were clearly present, but one of the essential elements of the crime of burglary—the entry of the building—was lacking. While the breaking of the lock on the gates might, in itself, be sufficient to constitute attempted burglary, without proof of an entry into the recess, we conclude that an entry of that space following the breaking of the gate lock was not an entry of the building.

The evidence establishes the guilt of the defendant of the crime charged beyond a reasonable doubt and he was properly convicted of attempted burglary under the indictment. The judgment of the criminal court of Cook County is affirmed.

*Judgment affirmed.*