(No. 32784.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* LEVI WILSON, Plaintiff in Error.

*Opinion filed September 24, 1953—Rehearing denied Nov. 16, 1953.*

Frank A. McDonnell, of Chicago, (William L. Carlin, and Louis A. Rosenthal, of counsel,) for plaintiff in error.

Latham Castle, Attorney General, of Springfield, and John Gutknecht, State's Attorney, of Chicago, (John T. Gallagher, Rudolph L. Janega, and Arthur F. Manning, all of Chicago, of counsel,) for the People.

Mr. Justice Daily delivered the opinion of the court:

An indictment returned to the criminal court of Cook County charged the defendant, Levi Wilson, with the crime of forcible rape by one count, and with the crime of assault with intent to murder in a second count. He was tried on these charges by a jury which found him guilty of rape as

charged and fixed his punishment at imprisonment in the penitentiary for a term of thirty years. Judgment was entered upon the verdict and defendant has prosecuted this writ of error to review the record of his conviction. In seeking reversal he contends: (1) That the evidence was insufficient to prove his guilt beyond a reasonable doubt; (2) that he was not properly or sufficiently identified; (3) that the court failed to give the jury proper instructions as to form of verdict; (4) that the court improperly instructed the jury on the law of the case; and (5) that the court committed prejudicial error in allowing in evidence part of a bloodstained shirt belonging to defendant.

The complaining witness against defendant was a twenty-year-old nurse who was employed by a hospital in South Chicago, where she also lived. At approximately 10:30 P.M. on the night of October 15, 1949, she was returning to the nurses' home from a movie and was proceeding in a westerly direction along Ninety-second Street. In the vicinity of Anthony Avenue she observed a man sitting on the curb next to a large, dark car. Shortly thereafter she observed the same car being driven toward her from an easterly direction and it was her belief that the man she had seen sitting on the curb was driving it. Within a few minutes the man approached her walking from the east. When he drew abreast he asked the prosecutrix where State Street was, to which she replied she did not know, and continued walking. She had taken but a few steps when she was seized from behind, her assailant putting one arm around her throat and a hand over her mouth. She was then dragged through a hedge to the lawn of a house located on Colfax Avenue about thirty-five feet from the corner of Ninety-second Street, where she engaged in a struggle with her attacker. When testifying she stated that she did not remember what happened after that until she found herself in the emergency room of the South Chicago Community Hospital.

As the struggle on the lawn occurred, Jeanette Komar, who lived at the address, arrived home and observed the two people. When she heard a girl scream "Somebody help me!" she ran diagonally across the street, first to the home of Donald Maxwell, then to the home of Edward Roman, to whom she reported what she had seen. Sometime later this witness returned to her own home where she observed the prosecutrix, "badly beaten up," on the porch steps with other persons. Close to midnight of the same night, she was present when the police removed a dark-colored four-door automobile which had been parked on Colfax by the side of the witness's residence.

In response to the Komar girl's alarm, Roman and Maxwell proceeded to the lawn in question. When within fifty feet they heard someone moaning and groaning and upon coming nearer observed a girl lying prone on the ground, with clothing disarranged and a man astride her between her legs. When the man saw Roman and Maxwell, he leaped up and vaulted the hedge and as he did so they noted that his privates were exposed. Roman leaped to grapple with the man, but was twice unsuccessful in trying to throw him to the ground. While this was occurring the man's privates were still exposed and a street light but twenty-five feet distant afforded both Roman and Maxwell several opportunities to see the face of their adversary and to observe his clothing. When the man finally broke from Roman's grasp, he fled down an alley and Roman and Maxwell gave chase.

They were joined by Ronald Giertych, a passing motorist who had stopped when he saw the struggle. When the pursuit proved unsuccessful, Giertych returned to the corner of Ninety-second and Colfax where the prosecutrix was being cared for by a young lady, who had been in Giertych's car, and other persons. Giertych and his companion then placed the complaining witness in his car and started for the hospital. En route they passed the corner

of Ninety-second and Phillips, where Giertych again observed the man he had pursued earlier. He stopped his car and again gave chase but could not catch the man. When he returned to his car again, a police car had arrived and he gave the officers a general description of the man he had pursued, then continued to the hospital with the prosecutrix. At the hospital, still another car of officers contacted this witness, and he repeated his description of what he had seen.

Police Officer Adolph Olson was one of the officers in the car which first contacted Giertych. Acting upon the latter's information, Olson drove the car around the vicinity and, at Ninety-third and Euclid, some twelve blocks from Ninety-second and Colfax, observed a man who fitted the description. As the officer turned his car around the man ran across a vacant lot next to 9238 Euclid Avenue. The officers made a search of the area and they found the man, who proved to be the defendant, Levi Wilson, crouched on top of a tub underneath a stairway in the rear of the house. He was breathing heavily and was wet with perspiration. When the officer asked him why he was there, defendant replied that he had had a fight with a couple of men down the street; that they had chased him and he was hiding there. The officer took him into custody, then proceeded to the hospital where the complaining witness had been taken.

At the hospital, medical examination disclosed that the prosecutrix was suffering from various abrasions and contusions on her face, scratch marks on her throat and thighs, a superficial laceration of the right labia majora, which is the entrance to the vagina, and a fracture of the right ankle. The examining physician, Dr. Nathan Friefeld, and Edna Collentine, a nurse who assisted him, appeared as witnesses at the trial and stated that the patient was in extreme shock because of her injuries but, despite her condition, was conscious and lucid and capable of making an

identification. When the doctor was asked if the girl had been raped, he replied: "I presume so."

When officer Olson arrived at the hospital with the defendant, they first encounted Giertych who identified defendant as the man he had seen. Defendant was then taken to the emergency room where, in the presence of officers Olson, O'Keefe and McMorrow, and nurse Collentine, the complaining witness identified him as the man who attacked her. Following this, defendant was taken to a police station where Roman and Maxwell, who were called there for the purpose, viewed him in the lockup and identified him as the man they had encountered under the circumstances heretofore related. The following day the witness Giertych again identified defendant by picking him out of a police showup of several persons.

While still at the hospital, officer O'Keefe questioned defendant about his arrest and defendant related that he had driven two men from Sixty-third Street and South Park Avenue, after they had engaged his automobile for hire, and that when they reached their destination, they refused to pay; that an argument developed during which one of the men started to fight; that three other men converged on the scene and started to attack defendant and that he was fleeing from these men when arrested. Defendant told the officer that this had occurred at Eighty-third and Essex, which is approximately two miles from 9238 Euclid Avenue and an additional three-quarters of a mile from Ninety-second and Colfax. O'Keefe searched defendant and found a city vehicle registration; following this he and his partner searched the areas referred to and found the vehicle for which the registration had been issued about fifty feet from the intersection of Ninety-second and Colfax. It was admittedly the defendant's car.

The persons referred to in the foregoing statement of facts all appeared as witnesses at the trial and testified in substance as the facts have been related. All repeated their

identification of the defendant at the trial and several of them identified the clothes defendant was wearing on the night of the attack, said clothes having been taken from the defendant at the time of his arrest. Despite an arduous cross-examination which sought to attack the veracity of the People's witnesses and to infer prejudice, they remained unshaken in their identification of defendant and in their account of the events leading to his arrest.

Defendant testified in his own behalf that he was twenty-six years old, a disabled war veteran and a law student in a Chicago university. To augment government disability allowance he sometimes peddled household items from door to door and in addition hired out his car as a jitney bus from time to time. He stated that sometime after 9:30 P.M. on the night of October 15, 1949, he agreed to drive a man and a boy from Sixty-third and South Parkway to Eighty-third and Essex; that while en route, he and the older passenger had gotten into an argument, and the latter, on arriving at their destination, had refused to pay the fare and started to fight. When three nearby men ran to the aid of the passenger, defendant fled north to the vicinity of Seventy-ninth and Essex. He saw a car approaching and recalling that he had left the keys in his own auto, thought his pursuers might have gotten in his car to overtake him, so he ran into a yard and concealed himself behind the stairs of a building. When his pursuer turned out to be a policeman, defendant testified he came from his hiding place and said: "Boy, I'm glad to see you," and that the policeman said: "Why did you run into the yard, nigger—you raped a white woman," and that when he denied the accusation the officer replied: "You'll do, any nigger will do."

Defendant insisted that he was arrested at Seventy-ninth and Essex rather than at 9238 Euclid Avenue and further testified that all of the identifications made that night were induced by suggestions of the police, in that he was either brought in and presented as the man who had

committed the crime or that the officers suggested to the witnesses that he was the guilty person. In like manner, he testified that he had been singled out in advance as the guilty party at the police showup conducted the following day. In this respect, one Harold Hobbs testified for the defense that he was one of the prisoners taken with defendant to a police showup on October 16 and that just before the showup he saw police officers point out defendant to four men and a woman and identify him by name. Defendant also claimed that he had been beaten and mistreated by the police both in the emergency room at the hospital and at the police station when the officers sought a written confession.

Much of defendant's testimony was centered about his war service and he testified that one of the results of injuries received in a bombing raid in 1944 was that he had been rendered impotent and that because of this he had been unable to have an erection since that time. He further stated that he had been hospitalized in various Army hospitals and that he was drawing one hundred percent disability pay from the Army. He denied having committed the offense and stated he had never been accused of any crime before in his life.

Doctor Arthur W. Roberson testified on behalf of the defendant and qualified as a specialist in the genitourinary and gynecology field of medicine. He related that he had been treating defendant for impotency from December 9, 1948, until May 26, 1949, and that it was his opinion that defendant could not, on October 15, 1949, have had sexual intercourse. This opinion of the witness was qualified, however, by these words: "He might have, but I doubt it, * * *." He further testified that he had examined defendant again on the day before the trial and was of the opinion that he was still impotent.

Defendant's fiance, Madeline Jones, testified that she was a graduate nurse, presently employed as an instructor

of nurses; that she was engaged to defendant and had seen him practically every day since 1948. She stated that he often complained of tiredness and that he occasionally limped in bad weather and that she had discovered that he could not have an erection. Later, however, she testified she had never been with defendant in such circumstances as to observe whether he suffered from physical impotence. Questioned in her capacity as a nurse she likened defendant's symptoms to those of paralysis patients she had observed. When questioned about patients in shock she stated that persons in extreme shock may be irrational and that information given in such state is not dependable.

Further witnesses for the defense were Rufus Jones and Ann Springer who testified to defendant's good reputation for truth, honesty and morality in the community.

In rebuttal, the People called Dr. Hector R. Vasquez, a medical examiner for the Veterans' Administration, who examined defendant in January, 1950, with regard to injuries the latter had sustained in service. While the witness did not completely examine defendant, he did produce the hospital records of the results reached by other doctors who participated in the examination and, also, the defendant's medical history record with the Veterans' Hospital. These records show that while defendant had complained of many things and had received extensive treatment for different injuries and ailments, he had never complained of impotency as being one of the results of his service injuries nor complained of any condition which would have led to an examination for impotency. Dr. Vasquez testified, and the medical records show, that the ailment for which defendant was receiving one-hundred-percent disability pay was tuberculosis.

Officers Olson and Szarek testified in rebuttal that defendant had been arrested at 9238 Euclid Avenue and not at Seventy-ninth and Essex and both denied the statements defendant attributed to the arresting officer. John

Williams, and his daughter Carol, who reside at 9238 Euclid Avenue, were called and told of witnessing an arrest on their premises on the night of October 15, 1949, and, in court, Carol Williams stated that defendant looked like the man. Officers O'Keefe and McMorrow and the witnesses Giertych, Roman and Collentine were also recalled and each denied that the identification of the accused had been induced by statements or representation on the part of the police. Roman and Giertych also denied that they had made any identification of defendant at Seventy-ninth and Essex or that they were near that site on the night in question and the officers denied that defendant had been beaten or mistreated either at the hospital or the police station.

The first ground for reversal asserted by defendant is that the evidence does not establish his guilt beyond a reasonable doubt. In attacking the evidence, it is contended that the prosecutrix's testimony makes it improbable that the man she had observed driving the car was the same man who attacked her and it is also urged that the evidence relating to the discovery of defendant's car is suggestive that some person moved his car to the scene of the attack for the purpose of manufacturing evidence against him. It is urged too, that Dr. Roberson's testimony that defendant was impotent, when coupled with defendant's steadfast denial of guilt and his good character, precludes a finding of guilty. From the evidence which has been related, it may be seen that the points of argument raised go more to the weight and credibility of evidence rather than its sufficiency, and to the question of whether we should accept the interpretation of the facts advanced by the defendant or the conclusion arrived at by the jury.

The rule is well known that the credibility of witnesses and the weight of evidence are, in the first instance, questions best determined by the jurors, who are in the best position to see and hear the witnesses and to observe their

demeanor while testifying. It is for them to accept the testimony they believe, reject what they do not believe, and return a verdict accordingly. On review in criminal cases, this court will review the evidence and if there is not sufficient credible evidence, if it is improbable and unsatisfactory, or not sufficient to remove all reasonable doubt of a defendant's guilt and create an abiding conviction that he is guilty, the conviction will be reversed. (*People* v. *Quevreaux,* 407 Ill. 176; *People* v. *Potts,* 403 Ill. 398.) In this case there is no contention that the *corpus delicti* has not been proved, but only that the identity of the defendant as the guilty party has not been established. The prosecutrix, Roman, and Maxwell identified defendant as the man who made the criminal attack, and Giertych identified him as the man who grappled with Roman and fled the scene. Their identification of his person was corroborated by the fact that their description of his clothing to the police proved accurate when defendant was arrested. The finding of his automobile at the scene, his flight and the manner of his arrest are all circumstances which add verity to his identification as the guilty person. The evidence relating to defendant's impotency on the date of the crime is not direct and positive, and, when it is weighed against the direct circumstances and events which connect defendant with the attack on the prosecutrix, we are unable to say that the evidence is so improbable or unsatisfactory as to require that the finding of the jury be disturbed.

The next contention made by defendant is that he was not properly identified. The testimony of one credible witness, if positive, is sufficient to convict even though contradicted by the accused. Where corroborated by other evidence, it is clearly adequate to justify a conviction. (*People* v. *Sproch,* 409 Ill. 55; *People* v. *Thompson,* 406 Ill. 555.) In the present case there is positive identification of the defendant by four witnesses, all of whom viewed him under circumstances which afforded them a clear opportunity to

see and recognize him, and all of whom made their iden-ification within two hours of the crime. In addition, the identification of defendant's person was corroborated by the identification of his clothing, by the discovery of his auto at the scene of the crime and by the circumstances of his arrest. The testimony relating to the question of whether the identifications were direct and positive, or induced and suggested by the police, is in direct conflict and was for the jury to decide. We cannot say that the decision mani-fested by its verdict was an erroneous one. The fact that defendant was brought alone before those who .identified him does not destroy the evidence of identification but merely affects its weight. (*People* v. *Thompson,* 406 Ill. 555; *People* v. *De Suno,* 354 Ill. 387.) We conclude that defendant was sufficiently and properly identified.

It is also contended that the trial court prevented the jury from exercising its right to choose between the two counts of the indictment because it did not instruct the jury nor give a form of verdict pertaining to the lesser offense of attempted murder. The record does not disclose that the defendant sought or requested the court to give such form of verdict or instructions. If an accused wishes certain instructions to be given, he should offer them and request the court to give them, since the trial court is under no duty to give instructions on its own motion. (*People* v. *Lindsay,* 412 Ill. 472; *People.* v. *Weisberg,* 396 Ill. 412.) Specifically, in *Spies* v. *People,* 122 Ill. 1, and *Dacey* v. *People,* 116 Ill. 555, this court held that if it be desired by the defendant that an instruction as to the form of verdict for the lesser offense be given, it is his duty to prepare and ask for such an instruction, and, failing to avail him-self of that right, he is in no position to complain. Further error assigned is that the trial court committed prejudicial error in charging the jury, in that three of the given in-structions were too abstract. We deem it unnecessary to set forth the content of the instructions complained of.

Considering them with others given as a series, it is our opinion that the jury was clearly and adequately instructed as to the elements of the offense, the duties of jurors, and as to the requirements of the evidence. A particular instruction need not contain all of the law, either of a case or upon a given subject; it is sufficient if the series of instructions, considered as a whole, fully and fairly announces the law applicable to the theories of the People and of the defendant, respectively. *People* v. *Shelton,* 388 Ill. 56; *People* v. *DeRosa,* 378 Ill. 557.

. During the trial, the court permitted the prosecution to introduce in evidence, over objection, a piece of defendant's shirt which was marked with bloodstains. Daniel T. Dragel, a chemist employed by the police crime laboratory, testified that the stains on the shirt were blood type "A" which was also the type of the complaining witness. He testified that he was unable to determine if it was the blood of the complaining witness; that he had been unable to secure an analysis of defendant's blood, and that approximately forty-nine percent of the people have blood type "A." Defendant, relying upon *People* v. *Arnold,* 248 Ill. 169, contends that the exhibit proved nothing, served only to inflame and prejudice the minds of the jury and that it was prejudicial error to admit it. In *People* v. *Bakutis,* 377 Ill. 386, and *People* v. *Shelton,* 388 Ill. 56, we distinguished the rule of the *Arnold case* and stated that where a defendant denied from the witness stand any act connecting him with the crime with which he was charged, soiled or torn clothing of a prosecutrix was admissible in evidence as tending to prove a circumstance to be considered by the jury along with all the other evidence. Applying the doctrine of the latter case to the facts of the present case, we hold it was not error for the court to admit the exhibit here complained of.

The purpose of reviewing a judgment of conviction in a criminal case is to determine whether or not the defend-

ant had a fair trial under the law, whether his conviction is based on evidence which properly established in the minds of the jurors the guilt of the accused beyond a reasonable doubt, and whether errors, if any are found in the record, could reasonably have affected the result reached by the jury. If the law is shown to have been fully met, it is the duty of this court to affirm the judgment. (*People* v. *Lindsay,* 412 Ill. 472; *People* v. *Fisher,* 340 Ill. 216.) Examining the record and errors assigned in this case in the light of this concept, we find no prejudicial error and are of the opinion that the judgment against the defendant is more than amply supported by the evidence and that he received the fair and impartial trial to which he is entitled.

The judgment of the criminal court of Cook County is affirmed.

*Judgment affirmed.*