(No. 34744-35532.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* OSCAR WALDEN, JR., Plaintiff in Error.

*Opinion filed September 29, 1960.*

McCoy, Ming & Leighton, of Chicago, (George N. Leighton, and Richard D. Gumbel, Jr., of counsel,) for plaintiff in error.

Grenville Beardsley, Attorney General, of Springfield, and Benjamin S. Adamowski, State's Attorney, of Chicago, (Fred G. Leach, Assistant Attorney General, and Francis X. Riley, and William W. Winterhoff, Assistant State's Attorneys, of counsel,) for the People.

Mr. Chief Justice Schaefer delivered the opinion of the court:

In September of 1952 the defendant, Oscar Walden, Jr., was convicted of rape and was sentenced to imprisonment in the penitentiary for a term of 75 years. In 1955 he filed a petition under the Post-Conviction Hearing Act, (Ill. Rev. Stat. 1959, chap. 38, pars. 826-832,) which was dismissed upon motion. We allowed his petition for a writ of error and remanded the cause for a hearing on the merits. (No. 2209, January 24, 1957.) Such a hearing was had, the trial court denied the petition, and we allowed a writ of error (No. 34744) to review that judgment.

Subsequently the defendant prosecuted a writ of error

from his original judgment of conviction. In both cases the defendant asserts that coerced confessions were admitted in evidence against him, and upon the writ of error to review the original judgment of conviction (No. 35532), he also contends that his guilt was not established beyond a reasonable doubt. The two cases have been consolidated in this court.

The complaining witness testified that she was returning home from her daughter's house about 10:00 P.M., on November 24, 1951. Near the intersection of 103rd Street and Michigan Avenue, she was grabbed by a man who dragged her into a nearby vacant lot. She struggled, and he repeatedly threatened to kill her. When he put his left hand in her mouth to silence her screams, she bit his fingers. She was held in the vacant lot for approximately an hour, during which her assailant raped her several times, committed an unnatural act upon her, and forced her to commit an unnatural act upon him. When she was finally released, she went to her daughter's house.

The daughter testified that her mother arrived shortly before midnight and said that she had been attacked by a colored man. The police were called, and the complaining witness described her assailant as being five feet eight or ten inches tall, with a flat nose, heavy lips and a soft voice. He wore glasses with thick heavy lenses, dark clothing and a hat.

The complaining witness was taken to a hospital. The examining physician testified that there were cinders and dirt on her hands and shins, her lips were swollen and bloody, there were numerous abrasions on her hands and bruises on her forearms and shoulders, and she was bleeding from the vagina.

The complaining witness remained in the hospital for several weeks and there confronted 15 to 20 suspects. After her discharge from the hospital, she viewed other suspects, both at her home and at the police station. She identified

none of them. On December 23, 1951, she saw the defendant at 103rd and Michigan and recognized him as the man who had attacked her. She testified that he saw her, went into a drug store, then emerged almost at once and "dashed across the street and boarded a northbound street car." On January 11, 1952, an employee of the drug store saw the defendant boarding a bus and notified the police.

At the hearing before the court and out of the presence of the jury on the question of the admissibility of the confessions, the defendant testified that he was arrested on a bus at 3:15 P.M., on January 11, 1952. He was taken to the Kensington Police Station and questioned briefly, and the complaining witness identified him as her assailant. He was then taken to police headquarters for a lie-detector test. He was again questioned at the Kensington station and was taken after dark to the Burnside Police Station which has sleeping facilities, where he spent the night in a cell.

Questioning was resumed at the Kensington station at 11:00 A.M., on January 12. The defendant testified that he was told that if he would confess, the police would urge leniency and that he would get "probation or six months." He also stated that the police threatened that unless he confessed, his parents would lose their jobs, be evicted from their home and placed in jail. He testified that police officers, particularly officer Sweitzer and officer Faculak, called him names, slapped him in the face, bent back his fingers and kicked him in the shins nearly 50 times, that he received a cut on a finger of his left hand, that his face was swollen, and that his shins were bruised and cut. He said also that the officers threatened to suspend him above the floor by a rope, take off his clothes and beat him with a rubber hose.

He testified that at about 1:30 P.M., on January 12, because of this force and coercion, he agreed to confess. He said that the police officers told him what to say, and also that he was told to apologize to the complaining witness. He did so, and then signed a written confession.

About 5:30 that afternoon, Patrick Egan, an assistant State's Attorney, came to the station with a court reporter. The defendant started to repeat his earlier confession, and then asked to be alone with Egan. Egan had the policemen leave the room, whereupon the defendant said that everything he had said previously was a lie and that he had been beaten and forced to confess. Egan testified that he examined the defendant's hands and face, that his fingers moved freely, his hands appeared to be in normal condition, and that his face bore no marks or swelling of any kind. Egan then had the available policemen enter the room, including Faculak, but the defendant could not identify any of them as the officers who had beaten him. The defendant repeated his story again while in Egan's office on the morning of January 14. Egan and the first assistant State's Attorney testified that they both then examined the defendant and that he had no marks, scars, abrasions, or contusions on his legs or elsewhere, and that there was no blood on his clothing.

Officers Sweitzer and Faculak and other policemen who were present at the Kensington station categorically denied the defendant's accusations. The defendant had attended a summer session at Moody Bible Institute and regarded himself as a minister. Faculak testified that on the morning of January 12 he gave the defendant a Bible, discussed his past life with him and told him that he had violated his religion and should tell the truth. After long periods of silence the defendant stated that he would like to apologize to the woman. The defendant testified that he did not receive a Bible until after he had signed the confession.

Captain Ryan testified that after the defendant had apologized to the complaining witness, he asked him how he had been treated and the defendant replied that he had been treated all right.

The trial judge ruled that the confessions were admissible. A similar hearing was had before the jury upon the

question of the credence to be given to the confessions. At the post-conviction hearing substantially the same evidence was offered, and in addition the defendant's wife, his mother, father, sister, and a minister testified that when they first saw the defendant on the evening of January 14 there was blood on his shirt and the defendant told them how the police had pressed back his fingers. They also said that the defendant's face was bruised and swollen, and that he showed them bruises and scabs on his shins.

The defendant's mother also testified that her son showed her a bloody handkerchief. The defendant testified, however, "There was no blood on my garments at the Kensington Station." In his post-conviction petition, the defendant stated that he was hit in the head on January 15 and used the handkerchief to wipe the blood from his face. When she testified for her son at the original trial, the defendant's mother did not mention anything about seeing a bloody handerkerchief or any other injuries. The minister and the other witnesses at the post-conviction hearing, except the defendant's sister, were available to testify at the original trial, but were not called.

If the defendant's confessions were coerced, their admission into evidence violated due process. (*People* v. *Sloss,* 412 Ill. 61, 69-70; *People* v. *Thomlison,* 400 Ill. 555, 561.) Whether they were coerced depends upon what happened in the Kensington Police Station between 11 :00 A.M. and 1 :30 P.M. on January 12. There is a direct conflict in the testimony as to what occurred there and as to the physical condition of the defendant on that day and the following day. This issue of fact was determined adversely to the defendant by the trial judge at the conclusion of the hearing upon the admissibility of the confessions. The jury's verdict indicates that it, too, did not believe the defendant. The judge who presided at the post-conviction hearing reached the same conclusion.

Most of the additional witnesses who testified on behalf

of the defendant at the post-conviction hearing were available at the time of the trial. The defendant's own testimony indicates that the blood upon his shirt and the bloody handkerchief, to which they testified, were unrelated to the events that preceded his confession. The defendant was ably represented both at his trial and upon the post-conviction hearing. We have carefully examined all of the testimony and we find no reason to set aside the determinations of those who saw the witnesses and heard them testify.

The defendant also urges that the State failed to prove his guilt beyond a reasonable doubt. He contends that apart from the testimony of the complaining witness there is no evidence to show that she was raped on the night of November 24, 1951. Although corroboration is not necessary where the testimony of the complaining witness is clear and convincing, (*People* v. *Trobiani,* 412 Ill. 235, 240; *People* v. *Polak,* 360 Ill. 440, 444-445) there was immediate complaint in this case. (*People* v. *Vaughn,* 390 Ill. 360, 365.) Moreover, the testimony of the complaining witness is also corroborated by the testimony of the doctor who examined her. The crime of forcible rape was established.

The defendant also argues that he was not properly identified because the complaining witness was brought to the police station for the purpose of identifying him and he was the only man taken before her to be identified. It is true that the weight to be given to identification testimony depends upon the method employed, (*People* v. *Fort,* 14 Ill.2d 491, 499; *People* v. *Wilson,* 1 Ill.2d 178, 189) but in this case the initial identification of the defendant was made by the complaining witness unassisted by the police. And from the fact that she had previously refused to identify many suspects brought before her for identification, it would appear that she was not unduly amenable to police suggestions.

The defendant's alibi after 8:00 P.M. on the night in

question was not corroborated by any witness, and the weight to be accorded to the testimony of his character witnesses was for the jury to determine. In our opinion the jury was warranted in finding that the defendant's guilt was established beyond a reasonable doubt.

The judgments of the criminal court of Cook County are affirmed.

*Judgments affirmed.*