(No. 35742.—

THE PEOPLE *ex rel.* George F. Garner, Appellant, *vs.* CARL CLUTTS, Sheriff, Appellee.

*Opinion filed November 28, 1960.*

PEYTON BERBLING, and W. C. SPOMER, both of Cairo, for appellant.

WILLIAM L. GUILD, Attorney General, of Springfield, and MICHAEL P. O'SHEA, State's Attorney, of Cairo, (FRED G. LEACH, Assistant Attorney General, of counsel,) for the appellee.

Per CURIAM : George F. Garner, hereinafter referred to as relator, was arrested as a fugitive from justice by the sheriff of Alexander County under authority of a Governor's warrant which had been issued on April 24, 1959, upon demand of the Governor of North Carolina. From the warrant, it appears relator had been charged in the demanding State with the crimes of first degree murder, burglary, and larceny, all of which were committed on September 28, 1955, in Madison County, North Carolina. He challenged the legality of his detention by a petition for writ of *habeas corpus* filed in the circuit court of Alexander County, the sheriff made a return by alleging the Governor's warrant and, after a hearing, the writ was quashed and relator remanded to the custody of the sheriff. As provided by section 10 of the Uniform Criminal Extradition Act, relator has prosecuted a direct appeal to this court for review. (Ill. Rev. Stat., 1959, chap. 60, par. 27.) The sole ground advanced here for the illegality of the relator's detention is that he is not a fugitive from the justice of North Carolina in that he was not present in such State at the time of the commission of the crimes alleged.

From the record, it appears that on the evening of September 28, 1955, at about 8:00 P.M., three armed men, wearing masks, entered the residence of Carson Lawson in a mountain settlement called Shut In Community, lo-

cated in Madison County, North Carolina. Lawson was a storekeeper and his store was adjacent to his home. The intruders bound those present with wire, ransacked the premises for twenty to thirty minutes, and departed after finding and taking $200 in currency. Lawson, who suffered from a heart condition, died during the course of the robbery. It was for these crimes that the demand and warrant for the relator issued.

To overcome the *prima facie* case of fugitivity made by the Governor's warrant, (See: *People ex rel. Borelli* v. *Sain,* 16 Ill.2d 321; *People ex rel. Mortensen* v. *O'Brien,* 371 Ill. 351; 20 I.L.P., Fugitives From Justice, sec. 22,) the relator testified in his own behalf, introduced documentary evidence and summoned seven witnesses who told of his presence in Cairo, Illinois, on the date in question.

According to relator, who testified he had lived in Alexander County, Illinois, for twenty years and that he had never been in the State of North Carolina, he resided in a motel just outside Cairo in September, 1955, and was then a partner with Fred Sullivan, Sr. in a coin-operated machine business that dealt with music boxes and pinball machines. He testified he had been in the partnership since 1953, that Sullivan had been seeking to dispose of his interest, and that he, the relator, had agreed on September 28, 1955, to purchase his partner's interest for the sum of $4000. Detailing the events of such date, relator testified that he and Sullivan reached their agreement about 10:00 or 11:00 o'clock in the morning, that he then went to the office of Homer McDaniel to have a bill of sale drawn, (the latter was a notary public who operated a sporting goods store adjacent to relator's place of business,) and that he, Sullivan, and Vincent Doss, the latter a repairman employed by the partners, returned to McDaniel's office about 2:00 or 3:00 o'clock in the afternoon, at which time the bill of sale was signed by Sullivan and witnessed by the relator and Doss. McDaniel notarized the document at

relator's request and relator paid Sullivan $4000 in cash, his testimony being that he had $2000 in savings and that he borrowed a like amount from his brother, Arthur Garner. The bill of sale, which bears the date of September 28, 1955, both in the body and the acknowledgment, was admitted in evidence.

Sullivan, McDaniel, and Doss corroborated relator's testimony with respect to the execution of the bill of sale. In so doing, McDaniel testified the instrument was dated the same day it was drawn and executed; Sullivan stated he had no independent recollection and could fix the day only from the date appearing on the bill of sale; and Doss, insofar as the abstract shows, gave no testimony relative to his recollection of the date. Arthur Garner, a resident of Sikeston, Missouri, testified he had furnished his brother with $2000, that he had not drawn the money from a bank but had the cash on hand, that he had brought the money to Cairo in the morning, and, although relator made no mention of the fact, that the relator had shown him the bill of sale the same afternoon. Arthur's wife, Mila Garner, recalled the morning when her husband brought the $2000 to relator, but testified she was not present when the money was turned over to relator and that she did not see the bill of sale. Further concerning the money, Sullivan testified he had been paid in cash and that, on the evening of the same day, he had used $2000 of it to pay a debt he owed to Charles Connell. The latter, who was also called as a witness, stated that Sullivan had borrowed $2000 from him in 1955 and had repaid it.

Returning to the testimony of the relator with respect to his movements and whereabouts on September 28, 1955, he testified that about 4:00 or 5:00 o'clock, after the bill of sale had been signed, he and Doss delivered a pinball machine to a tavern at which time he told the operator, Murray Bryant, about purchasing Sullivan's interest and showed him the bill of sale. Doss likewise recalled this

occurrence and Bryant, who operated the tavern in question for Sullivan, testified he had read the bill of sale on such occasion and that he saw the instrument on the day it was dated.

Relator further testified he had shown the bill of sale to Dave Kessler, owner of the motel where the relator resided, as the two men were having coffee in the motel about 9:00 or 10:00 P.M. Kessler, who had purchased the motel from Sullivan, verified relator's version of their meeting and stated he had been shown the bill of sale on the day it was made.

Following the foregoing evidence presented by the relator, the testimony of several persons from the demanding State was introduced in rebuttal. One such witness was Ed Church, a brother-in-law of Carson Lawson, who was present in the home of the deceased when the robbery occurred, together with his wife (since deceased,) Lawson, and the latter's 88-year old mother. Church, who was 70 years old when he testified, related that at about 8:00 P.M. on September 28, 1955, while those present were watching television, a light was noticed on the porch, whereupon Lawson went out, thinking it was a customer at his store. He returned shortly accompanied by three armed men who tied up the occupants and started ransacking the house for money. All of the men were wearing Army fatigue clothes and their faces were covered with "something like a silk stocking" or "thin plastic." One robber stood watch over the occupants and it was Church's testimony that he observed this man closely for twenty to thirty minutes, that he could see the face of the man through the stocking, that he had no difficulty in identifying the man, and that the relator was the man.

When the witness was cross-examined, he testified that, during a period extending from the fall of 1957 to the fall of 1958, the sheriff of Madison County showed him pictures of various men and that he had viewed about 19

or 20 pictures before he identified the relator as being one of the men involved in the robbery. He further stated he had last seen the relator's photograph the day before he testified in the present cause, that relator's name was written on the back, and that it had been exhibited to him by the sheriff who told him: "that is supposed to be the man."

From further cross-examination of Church, as well as other portions of the record, it appears that Doss and one of the relator's attorneys paid a visit to Church in North Carolina in April, 1959. When questioned concerning what had occurred during such visit Church denied making a statement that he could not recognize any of the three robbers because of their disguises, and testified he could not remember whether his visitors had shown him pictures or not. Church did concede, however, that upon the occasion of a deposition taken later in 1959, he had erroneously identified a picture of relator's brother and explained his mistake by stating that the brothers "favored" each other.

The next rebuttal witness was C. W. Burrell, a resident of Madison County, who stated that he was a minister, a mechanic employed by the board of education, and a former police officer. He testified that on September 28, 1955, he and a companion, Marvin Ball, were fishing at a lake about 35 miles from the community where the robbery occurred. They stopped fishing about 7:00 P.M. and started for home on a route that took them through Shut In Community at a point very near Carson Lawson's store and home. They drove through the Community about 7:45 P.M. and pulled off the highway shortly thereafter to effect a change of drivers. As they were stopped, an Oldsmobile automobile, with out-of-State license plates, passed by and pulled up in front of the parked car. There were three men in the Oldsmobile, two in the front seat and one in the back seat directly behind the driver. Burrell, who was standing outside his own car, testified that the passenger in

the front seat of the Oldsmobile got out, walked up to the witness and inquired as to the whereabouts of the nearest telephone. Upon being advised the closest phone was at Hot Springs, the man then inquired if there was a phone at the Lawson store and upon receiving a negative answer returned to the Oldsmobile. Burrell and his companion then drove off. It was Burrell's testimony that both the man he talked to and the man in the back seat were dressed in coveralls, that he could not say how the driver was dressed, and that relator was the man who had talked to him. He stated he thought nothing about the incident at the time, but the following day, when he heard of Lawson's death, he reported it to the sheriff.

On cross-examination the witness stated the conversation lasted about two minutes and that it was not yet dark although night was beginning to fall. It was developed that he, too, was shown pictures of suspects by the sheriff from time to time, and he stated that it was in 1958, eight months before he testified, that he had identified relator from a picture as being the man to whom he had talked at the side of the road.

Marvin Ball, Burrell's fishing companion, also appeared as a witness and identified relator as the man who had gotten out of the Oldsmobile and inquired about the nearest telephone. The witness stated it was not dark, that he was six to eight feet distant while Burrell was talking to the man, and that the latter was dressed in green Army fatigue clothes. He was questioned about the incident by the sheriff the following day and, as was true of the other rebuttal witnesses, was shown pictures of suspects from time to time. It was in 1958 that he too identified relator from a picture.

The final rebuttal witness was Dewey Foster who resided about one-half mile from Lawson's store and who, at about 8:00 P.M. on the night in question, was waiting for some friends at an intersection of a highway (the same

one used by Burrell and Ball) and a gravel road leading to the Lawson store. As he stood there, and just as one of his friends pulled up in a truck with its headlights on, the witness observed a late model car with out-of-State plates approaching slowly along the highway. It was his testimony that the car almost stopped as it came abreast of him at a distance of ten feet, and that, aided by the headlights from the truck, he could see the faces of the three occupants. He identified relator as the man seated next to the driver and stated the latter was dressed in what appeared to be work clothes. When cross-examined, he testified that the car was going 3 to 4 miles per hour when it passed him, that he viewed the occupants for about 4 to 5 seconds, and that he had identified relator from one of several pictures shown to him by the sheriff.

In surrebuttal, relator introduced the testimony of Vincent Doss and W. C. Spomer, the latter one of relator's attorneys, who told of a visit they had made to Ed Church in April, 1959, while the extradition proceeding was pending before the Governor of Illinois. According to both men, Church was shown a picture of relator and could not recognize him, and stated he could not recognize any of the three men because of the stockings they wore over their heads.

At the conclusion of all the evidence, the trial court ruled that the evidence on the question of relator's presence in or absence from the demanding State was merely contradictory and, on this basis, quashed the writ. Upon this appeal it is the relator's contention that the trial court had a duty to weigh the evidence and that, had this been done, the manifest weight of the evidence conclusively establishes that relator was not in North Carolina when the crimes charged to him were committed. Such a contention, in turn, first poses the issue of the degree of proof required in a *habeas corpus* proceeding to avert an extradition order by executive authority, or, as it is cogently put

in *Brewer* v. *Goff*, (10th cir.) 138 F.2d 710, 712, the degree of proof necessary to subject the executive determination of fugitivity to judicial impeachment.

The issue is not a new one, having been directly before this court as recently as *People ex rel. Webb* v. *Babb,* 5 Ill.2d 35, and, prior to that, in *People ex rel. Guidotti* v. *Bell,* 372 Ill. 572. While it is stated by one authority that there is no definite rule as to the degree or character of proof required to defeat the *prima facie* case made by the Governor's warrant of extradition, (25 Am. Jur., Habeas Corpus, sec. 72,) this court has consistently invoked and applied the time-honored principles promulgated in *Munsey* v. *Clough,* 196 U.S. 364, 49 L.ed. 515. There, after pointing out that strict common-law evidence is not necessary and that the evidence of fugitivity "must be at least evidence which is satisfactory to the mind of the Governor," the court held that one detained under a fugitive warrant may be judicially discharged only when it is so conclusively proved that no question can be made that the person was not in the demanding State when the crime is said to have been committed, and added that a court will not discharge a person detained where there is merely contradictory evidence on the subject of his presence in or absence from the demanding State, inasmuch as *habeas corpus* is not the proper proceeding to try the question of alibi, or any question as to the guilt or innocence of the accused. Among the numerous decisions to apply these principles are: *People ex rel. Webb* v. *Babb,* 5 Ill.2d 35; *People ex rel. Eveland* v. *Harrell,* 404 Ill. 81; *People ex rel. Thompson* v. *Lonie,* 374 Ill. 322; *People ex rel. Downer* v. *O'Brien,* 373 Ill. 383; *People ex rel. Guidotti* v. *Bell,* 372 Ill. 572; *People ex rel. Chevlin* v. *O'Brien,* 372 Ill. 640; *People ex rel. Buxton* v. *Jeremiah,* 364 Ill. 274; *People ex rel. McCline* v. *Meyering,* 356 Ill. 210; *People ex rel. Wortman* v. *Munie,* 354 Ill. 490; *Lacondra* v. *Hermann,* 343 Ill. 608, and many others.

The doctrine laid down in *Munsey* v. *Clough* was reasserted by the Supreme Court of the United States in *South Carolina* v. *Bailey*, 289 U.S. 412, 77 L.ed. 1292, wherein the court was called upon to review a judgment of the Supreme Court of North Carolina releasing a prisoner sought by South Carolina. After reviewing the holdings of *Munsey*, the court said: "Considering the Constitution and statute and the declarations of this Court, we may not properly approve the discharge of the respondent unless it appears from the record that he succeeded in showing by clear and satisfactory evidence that he was outside the limits of South Carolina at the time of the homicide. Stated otherwise, he should not have been released unless it appeared beyond reasonable doubt that he was without the State of South Carolina when the alleged offense was committed and, consequently, could not be a fugitive from her justice. The record discloses only a conflict of evidence; the requirement which we have indicated has not been met; and the challenged judgment must be reversed." From this language, as well as the whole body of precedent in this court and the Federal Courts, it emerges clearly that neither the trial court nor a court of review is at liberty to weigh the evidence, or to discharge an accused, when the evidence on the fact of his presence in or absence from the demanding State is merely contradictory.

Although we may not weigh the evidence to resolve the issues here there is inherent in relator's arguments a claim that the *prima facie* case made by the Governor's warrant has been successfully overcome in that the rebuttal testimony introduced by the respondent is so improbable and unreliable that the evidence given in the relator's behalf must be taken as establishing, clearly, convincingly and without contradiction, that he was not in the State of North Carolina when the crimes were committed. Specifically, it is urged that the testimony of Foster, Burrell, and Ball is so inherently improbable that it should be disregarded, and

that the testimony of Ed Church is without probative value in view of his prior contradictory and inconsistent statements and the influence created when the sheriff of Madison County showed him the relator's picture the day before the trial.

While it is our belief, without making a detailed legal or factual analysis, that some merit attaches to relator's contentions insofar as they relate to the testimony of Church and Foster, we do not find that the testimony of Burrell and Ball is subject to the infirmity charged. Both men testified it was not yet dark when they encountered relator on the road, and the testimony of each establishes they were able to view the relator under favorable conditions for a substantial length of time. Although it was not until about three years later that they identified relator from a picture, we see no more improbability in this circumstance, particularly when the incident was indelibly impressed upon their minds by the death of Lawson, than we do in the fact that relator's witnesses were able, about four years later, to recall minute details of the events of September 28, 1955, and the contents of the bill of sale. It is to be noted, too, that both men identified relator only after viewing numerous photographs, a circumstance which has been looked upon as pointing up the reliability of an identification finally made. See: *People* v. *Walden,* 19 Ill.2d 602.

Although it does not appear in the statement of facts presented in relator's brief, he asserts in his argument that Burrell, too, impeached himself when, on the occasion of a pretrial hearing held in June, 1959, he identified another man as the person to whom he had talked at the side of the road. A critical examination of the abstract reference given in support of this claim, and the record itself as well, reveals it to be without substantial foundation. While relator's counsel, on cross-examination, did bring out that the witness had been shown pictures at the pretrial hearing, it was

never established just what pictures were shown to him or whose picture he identified.

In view of the conflict in evidence created by the testimony of Burrell and Ball, we cannot say that the relator has met his burden of proof with the clear, convincing and doubt-free evidence required in such cases. Accordingly, it is our opinion that the circuit court of Alexander County properly quashed the writ, and its judgment is affirmed.

*Judgment affirmed.*