(No. 36353.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ROBERT LEE, Plaintiff in Error.

*Opinion filed September 22, 1961.*

McCoy, MING & LEIGHTON, of Chicago, (GEORGE N. LEIGHTON, of counsel,) for plaintiff in error.

WILLIAM G. CLARK, Attorney General, of Springfield, and DANIEL P. WARD, State's Attorney, of Chicago, (FRED G. LEACH, Assistant Attorney General, and JOHN T. GALLAGHER and JAMES R. THOMPSON, Assistant State's Attorneys, of counsel,) for the People.

Mr. CHIEF JUSTICE BRISTOW delivered the opinion of the court:

Defendant, Robert Lee, seeks review of a judgment of the criminal court of Cook County finding him guilty of raping his 16-year-old stepdaughter, and sentencing him to a term of seven years in the State Penitentiary. The sole issue on this review is whether defendant was proved guilty beyond a reasonable doubt.

From the record it appears that the complaining witness, Frances Jean Maloney, had lived in Indianapolis, Indiana, prior to her mother's marriage to defendant in December 1957. There she was an honor student at the Chrispus Attucks High School, which her mother and uncles had also attended years before. At the time of the alleged events in October 1959, the girl was 16 years old and lived with her mother, her 84-year-old grandmother, two brothers, an infant sister, and her stepfather, the defendant, in a two-bedroom apartment on the south side of Chicago. She and her 13-year-old brother, Arnold, slept in a small den, to which there was no door, and the boy's bed was about three or four feet from hers.

According to her testimony, sometime after she had gone to bed on the night of October 12, 1959, she was awakened to find defendant in bed with her. He held something like a sheet tightly around her neck so that she could not scream, and he warned her not to make any noise or he would pull it tighter. While struggling, she reached down and grabbed a shoe, which she threw at her brother to awaken him. The crotch of her pajamas had been cut, and defendant criminally assaulted here. After a few minutes, defendant got up, and the girl went into the bathroom crying. She claims defendant followed her and put his hand over her mouth to keep her quiet and that her brother summoned the mother, who had been asleep in the bedroom with the infant. The girl, the mother and defendant then went into the bedroom, where the girl told the mother what had happened. The mother said she didn't know what to do, and defendant said, "We discuss it." The girl was then told to go back to bed. In recalling this occasion, she testified that she did not bleed, and could not remember "if she was irritated."

In connection with this episode the 13-year-old brother testified that he awoke and heard defendant talking "sex talk" to his sister. As he faced the wall pretending to be

asleep, he heard a tussle, and a few minutes later something hit him. He turned to find his sister half on the bed and half on the floor, and his stepfather trying to put her back into the bed. When his stepfather walked away, his sister went into the bathroom crying and his stepfather followed her. The boy ran to get his mother from the bedroom, and she came and found the girl lying on the bathroom floor hysterical. The stepfather was "down there trying to get her up, and had a towel in his hand." After a while the mother, stepfather and girl went into the bedroom, and the boy went back to bed. He did not hear what they were talking about; nor did he hear anything in connection with the other alleged rapings.

The girl testified further that defendant raped her again on October 19, 20, 21 and 23. On each of these occasions he held a cloth tightly around her neck and warned her not to scream out. After the experience of the 20th, the defendant said, "Do you mean this is your first time?" When she said, "Yes," he told her that she might be unhappy at home, but if she ran off and got married he'd slit her throat. When she told her mother about this, the mother said that she didn't know what action to take. Defendant kept saying that they should keep it in the family and not tell the uncles, and that he wouldn't do it again. On the last occasion of October 23, the girl was sleeping in her mother's bedroom and the mother was supposed to be sitting up in the living room so that the girl could sleep undisturbed. The mother fell asleep, however, and according to the girl's testimony, defendant came in with a knife, with which he cut her cheek, and warned her that if she didn't be still he would make her pregnant. When the girl told the mother what had happened, she asked her mother if she might go someplace else to live. The mother reportedly said that it would probably be the only solution.

The following morning the girl went to the drug store and telephoned a Mrs. Wickliffe, the director of the De-

partment for Exceptional Children at Chrispus Attucks High School in Indianapolis, who had befriended the girl when she was at the school. She told the woman that she had to go to Indianapolis, that something serious was going on in their home, and that her stepfather had molested her. Later that afternoon, Mrs. Wickcliffe and a friend arrived at the Lee apartment. According to Mrs. Wickliffe's testimony, the stepfather was home and there was much tension. The girl and her mother both said they were frightened, and the mother explained that her husband didn't want the girl to leave. When they were in the bathroom alone, the mother told the woman that she wanted the girl to go to Indianapolis. Mrs. Wickliffe then left, saying that she would return later.

On her return around 10 o'clock that night, Mrs. Wickliffe was accompanied by her friend and two police officers, whom she had called because she was fearful of the area and of defendant. When Mrs. Wickliffe asked the mother to sign the paper, prepared in the interval, which would give the woman the right to take the girl to Indianapolis, the mother said she didn't know anything about it. Defendant prevented Mrs. Wickliffe from talking further to the mother, and belligerently told them that the girl couldn't leave. Mrs. Wickliffe then told the girl to tell the officer what had happened, and the girl told the police officers in defendant's presence that he had raped her five times.

The arresting officer testified that he had been told that the girl had been molested by her stepfather, and that he and his partner went up to the Lee apartment with Mrs. Wickliffe to see what it was all about. Defendant became belligerent about the girl's leaving. The officer said that serious charges had been made, which he intended to investigate. After the girl told about the rapes, in defendant's presence, the officer asked her whether she would be willing to make formal charges, and she agreed to do so. The officer then placed defendant under arrest, and asked the where-

abouts of the mother. Apparently she had been in bed, and when asked by the officer, in defendant's presence, if she were aware of her daughter being raped, she said that she was, but couldn't do anything about it because the police weren't there and she had no phone. They all went down to the police station, where, according to the officer's testimony, the girl repeated the accusation against defendant, the mother again said that she felt there wasn't anything that could be done about it and she didn't want to bring embarrassment on her family, and defendant refused to make any statement without his attorney.

The officer further testified that he noted at the time the scar on the girl's cheek, and she explained that it was made by defendant with a knife when he was raping her. The following day defendant stated in the officer's presence, when questioned in the assistant State's Attorney's office, that he had awakened the girl on several occasions after she had retired for the night "to look at television with her."

The girl was taken to the Juvenile Home. She was examined by a doctor on October 26th. According to the medical report and testimony, the hymen was "distensible and irregular," and the vagina admitted two fingers, suggesting prior intercourse. There was vaginal and menstrual discharge during the examination, and no recent lacerations or evidence of recent rape. The doctor admitted that if the assault had taken place two weeks before, the lacerations would have healed. The last normal menstrual period was on the "10th-25th-1959."

At the trial the mother reluctantly testified as the court's witness. She stated that the girl complained to her on one occasion during that week that "she—her rest had been disturbed and suggested that he (defendant) had molested her." The mother admitted that she signed the complaint, but said that she had been confused and "hurled into something," and she knew of no rape until she was at the police

station. She admitted, however, making an examination of the bed clothes at the time her daughter complained, "on the basis of curiosity." With respect to her daughter's veracity, she said, "I feel that perhaps she will—I will negate that. She will, as will all adolescents, falsify a fact if she has some particular point to make by so doing."

The defendant denied having carnal knowledge of the girl, and claimed he merely awakened her to watch television with him, and she occasionally objected to this. He testified that she struck him and he struck her back and then used the foul language. There were in addition two witnesses who testified that defendant's general reputation in the community was good.

Defendant contends that it was error for the trial court to enter a finding of guilty, since the uncorroborated and contradictory testimony of the prosecutrix did not constitute proof of the crime beyond a reasonable doubt.

Although corroboration was unnecessary (*People* v. *Walden,* 19 Ill.2d 602, 608), our review of the record shows that the girl's account of the rape on October 12, 1959, was corroborated at least circumstantially by the testimony of her brother. His account of hearing the tussle and defendant's sex talk, of being struck by something, which the girl claimed she threw to awaken him, of seeing defendant struggling to put his sister back into the bed, of her going into the bathrom crying, of his running to get his mother, of the bathroom scene with his sister lying hysterical on the bathroom floor, and their all going into the bedroom afterward, substantiates the girl's testimony of what transpired, rather than defendant's story of a quarrel because the girl objected to his waking her to watch television.

The prosecution's case is also strengthened by the police officer's testimony that the mother originally admitted in defendant's presence, both at the apartment and at the police station, that she knew about the rapes but didn't know what to do about them, since she had no phone to call the

police and didn't want to embarrass the family. These admissions, together with the fact that she signed the complaint, certainly affect the credibility of her subsequent testimony, as the reluctant witness of the court, that she had no knowledge of the rapes, and thought that her daughter, like all adolescents, might falsify a fact to make a point. A careful reading of the record, moreover, indicates that she was in fear of defendant. She openly expressed such fear to Mrs. Wickliffe, and it is reflected in her conduct at the apartment. The fear seems to be not without basis in view of the 3-inch scar, or "scratch" as defendant's counsel refers to it, on the girl's cheek, inflicted by defendant, and which he did not deny.

Of further significance in support of the prosecution is the fact that defendant did not deny the rapes when accused by the girl at the apartment and again at the police station. There, according to the testimony of the police officer, he merely refused to say anything until he had a lawyer. The television explanation and denial came later. The trial judge apparently gave limited credence to it and did not consider it sufficient to raise a reasonable doubt. Nor do we.

Nor is such doubt created by the medical report and testimony. It shows at most "no recent evidence of rape." However, the doctor admitted that any lacerations on the 12th would have healed within two weeks. The examination, moreover, was impeded by the reported vaginal and menstrual discharge. The presence of such menstrual discharge on the 26th, when the examination was made, substantiates the prosecution's interpretation that the girl's last monthly period began on October 25th, so that she could have been raped on the 12th without any bleeding, just as she testified. The phrase "last normal monthly period it was on the 10th-25th-1959" obviously refers to the 25th day of October, which is the 10th month, and does not mean that normal menstruation occurred on both the 10th and 25th of the month or extended between the dates, as defendant sug-

gests, in trying to show that she would have been bleeding on the 12th when the rape occurred.

Nor do we perceive any merit in any other alleged contradictions in the girl's testimony. The fact that she was characterized as bright and used polysyllable words, and did not like her stepfather, or was happier in Indianapolis, do not constitute evidence rebutting the rape. Those were factors bearing on her veracity and were in the domain of the trial judge to evaluate.

On the basis of our analysis of this record, we find that the defendant was proved guilty beyond a reasonable doubt, and there are no grounds for setting aside the sentence.

*Judgment affirmed.*